[No. S004605. Crim. No. 23532. July 6, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALD FRANK STANLEY, Defendant and Appellant.

**COUNSEL**

Richard J. Petersen, Michael Satris and Frank E. Hagie, Jr., under appointments by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, James T. McNally, Edmund D. McMurray, Thomas Y. Shigemoto, Ward A. Campbell, W. Scott Thorpe and Ruth M. Saavedra, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WERDEGAR, J.**—A jury convicted Gerald Frank Stanley of the first degree murder of Cindy Rogers Stanley (Pen. Code, §§ 187, 189)[1] (count I), arson of an inhabited dwelling (§ 451) (count II) and burglary of an inhabited trailer coach (§ 459) (count III). The jury also found that defendant personally used a firearm in the commission of the murder. (§ 12022.5.) The jury found true the special circumstance allegations that defendant committed the murder while lying in wait (§ 190.2, subd. (a)(15)) and for the purpose of preventing the victim's testimony as a witness in a criminal proceeding (§ 190.2, subd. (a)(10)). In a separate proceeding the jury also

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

found true the special circumstance allegation that defendant had previously been convicted of second degree murder. (§ 190.2, subd. (a)(2).) Pursuant to the parties' waiver of jury trial, the court found true the allegation that defendant had served a prior prison term and had not remained free of prison custody for five years without commission of another felony offense resulting in a conviction. (§ 667.5, subd. (b).) Following a competency trial (§ 1369) at which the jury found defendant mentally competent, the jury returned a verdict of death; the court entered judgment accordingly. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

## I. FACTS

### A. *Guilt Phase*

Defendant met the victim, Cindy Rogers, on July 3, 1980, at the fairgrounds in Hayfork, Trinity County. He was introduced to Cindy by Gary Wells, a friend of defendant's brother John. Defendant was a professional hunting guide. At the time, he was on parole and trying to gain custody of his two children by his second wife, whom he had murdered in 1975.[2] On July 7, 1980, he and Cindy were married in Reno. On their return to California the next day, the pair went to Lake County where Cindy's parents, the Spatigs, owned and operated the Spatig motel-resort in Nice, near Clear Lake.

On July 16 defendant allegedly committed three felony offenses against Cindy, the nature of which were kept from the jury.[3] On July 18 defendant burned down Cindy's house in Lucerne, Lake County. On July 20 he burned her car.

On July 20 Cindy filed felony charges against defendant for the July 16 offenses; based on the charges, a parole violation warrant issued for defendant's arrest.

From July 20 to August 11, the day of her death, Cindy stayed away from defendant. On July 20 she and her entire family spent the night in a motel in Ukiah. Thereafter Cindy stayed variously with a longtime friend and co-worker, Stan Simpson, a new friend, Patrick Pounden, and her parents at

---

[2]During the guilt phase of trial, the jury knew only that defendant was on parole and seeking custody of his two children. Not until a separate trial on the prior-murder-conviction special circumstance did they learn that the crime for which defendant had been imprisoned was the second degree murder of his previous wife.

[3]Defendant allegedly beat and raped Cindy and forced her to orally copulate him.

their resort. On the evening of August 11, 1980, defendant, armed with a high-powered scope rifle, positioned himself behind a tree across the road from the Spatig resort. Just before 10 p.m., Cindy, her father Frank Spatig, and Simpson moved their lawn chairs from a patio area where they had been seated to a more open location near the resort swimming pool facing Highway 20. Cindy's son was playing in the pool. Shortly after the three seated themselves by the pool, Frank Spatig got up and turned on the pool area lights. As Spatig sat down again, defendant shot Cindy through the heart; she died almost instantly. Defendant then fled.

On August 12, defendant burglarized a mobilehome. On August 13 he was arrested at the house he shared with his mother in Anderson, Shasta County.

The evidence against defendant was circumstantial. Briefly stated, the prosecution evidence showed defendant was concerned he would not obtain custody of his children if Cindy pressed the criminal charges against him. Sometime in the latter part of July, defendant's mother, Mrs. Stanley, called Cindy's mother, Bobbie Spatig, to ask her to convince Cindy to drop the charges against defendant. On July 20 defendant made an anonymous telephone call to Sergeant Adkins of the Shasta County Sheriff's office in which he reported he had met Gary Wells at the Harbor Bar in Clear Lake a few days earlier, they had been drinking heavily, and Wells had told him he was going to kill Jerry Stanley and Cindy Stanley, because Cindy had been his girlfriend and Jerry Stanley had married her after knowing her only a few days. On August 4 defendant's mother, Mrs. Stanley, rented a silver-gray Camaro for defendant at his request, because the other vehicles to which he had access were known to law enforcement and he was unwilling to turn himself in on the parole violation at that time. On the day of the shooting defendant was seen at the Island Park Cafe in Lake County and, about 4 p.m. the same day, in nearby Williams in Colusa County.

After the shooting, witnesses near the site from which the shot was fired saw a man running past their home, carrying a gun and wearing what appeared to be a jacket. He disappeared into the darkness. Shortly after, they saw a car start to move, its lights and engine off. After the headlights were turned on and the engine started, the car turned left onto Highway 20 east toward Lucerne and the Harbor Bar. The murder weapon, a Browning rifle with a Redfield scope, subsequently was found about 18 to 20 feet out in the lake off the Harbor Bar. The rifle had been purchased by Edna Stanley.

About 10:50 or 10:55 p.m., a car traveling east on Highway 20 approached a police roadblock. The car pulled to the side of the road for a second or two and then made a U-turn and proceeded westbound in the

direction from which it had come. Police officers gave chase. They noticed a cloud of dust floating across the highway from a private driveway, indicating someone had turned up the driveway at a high speed. Following the trail, the officers found the Camaro abandoned behind a residence where it had come to a skidding stop due to a log blocking the driveway.

During the early morning hours of August 12, defendant broke into a mobilehome on the Spartan Ranch, nine to ten miles from where the Camaro was abandoned. Later that day he walked to Highway 20, where he hitched a ride with the Pauls, a couple returning from a camping trip in Fort Bragg. The Pauls dropped defendant off in Anderson. The next day, after the Stanley house was surrounded by police, defendant surrendered.

A search of the Camaro yielded, among other things, a loaded rifle, an empty rifle case, binoculars out of their case, a corduroy jacket, a knit cap, a ski mask, and a spiral notebook containing a letter in defendant's handwriting to his parole agent, John Ransom. Defendant's fingerprints were found on the car trunk and the notebook. The dome light, intact and working when the car was rented, had been removed from the ceiling of the car, thus preventing a light from going on when the car door was opened. An excerpt from the letter to Ransom read in part as follows: "John, when you read this I will be dead! Better this way as my life and everything I fought for has been destroyed. My fight for my kids I can never win now."

A search of defendant's room in the Stanley residence in Anderson yielded Winchester 30.06 150-grain ammunition consistent with the spent cartridge in the chamber of the Browning rifle and with the lead taken from Cindy's body, as well as a photograph of defendant holding the Browning rifle. A spent 30.06 cartridge was found in the living room. The evidence also showed that the Browning had been carried in the empty rifle case found in the Camaro.

While in custody, defendant, at his request, spoke with Sergeant Coulter. Defendant told Coulter that the evening of the murder he was with two people named Gary and Linda, who were involved in drug deals in Lake County. He went with them to the Harbor Bar, where he waited in the car while they made some phone calls. He then drove them east on Highway 20. When they approached the roadblock, Gary told defendant to turn around. As they got to the dirt driveway, Gary told him to stop, whereupon Gary and Linda jumped out into the brush while defendant continued up the driveway. At trial defendant admitted the entire story was a lie.

Defendant testified in his own defense. He denied killing Cindy. He stated he was on the telephone talking to his mother at the time of the murder. Mrs.

Stanley corroborated his testimony. Defendant's theory was that Cindy had been killed either by his brother, John Stanley, or by Gary Wells or Mike Saylor, but most likely by Wells. Wells had introduced Cindy to defendant and allegedly was jealous that Cindy had married him. Wells also supposedly was concerned about a conversation overheard by Cindy that implicated John Stanley, Saylor and himself in a robbery they had committed. Neither Wells nor Saylor had a verifiable alibi for the evening of the murder.

## B. *Penalty Phase*

In the penalty phase the prosecution presented evidence of the circumstances surrounding defendant's 1975 murder of his second wife, Kathleen (Kathy) Rhiley Stanley. The prosecution also presented evidence of uncharged offenses committed by defendant involving violence or threats of violence. Finally, the prosecution presented evidence that, one day before he killed his wife Cindy, defendant murdered Cheryl Renee Wright. In mitigation, defendant presented, inter alia, testimony of his mother and other family members and certain mental evidence.

### 1. *Conviction for 1975 Murder of Kathy Stanley*

Jackie Foster, an eyewitness to Kathy Stanley's murder, testified that on January 14, 1975, she saw defendant waiting near the office at his daughter Kristie's school. As Kathy Stanley drove up the school driveway to let Kristie out, defendant jumped into the car on the passenger side. Foster heard Kathy and defendant's two children scream and saw Kathy try to get out of the car. With the two children between them, defendant grabbed Kathy underneath the neck and twice shot her. Kathy fell out of the car, and defendant ran away with Kristie while his son J.J. tried to follow them.

Defendant's first wife, Linda Faith, testified he called her the day after Kathy's murder. He told her he was going to pretend he was mentally ill, knew how to get away with that with the psychiatrist, and would be out in two or three years. He also threatened to "take care of her" like he did Kathy.

Kathy's mother, Crystal Rhiley, testified Kathy and defendant had separated in October 1974 after seven and a half years of marriage. At that time Kathy moved to Oakland for a few weeks, then stayed with a friend in a trailer park in Vacaville, and finally moved to her mother's house. In October 1974 defendant came to Crystal Rhiley's house looking for Kathy, and threatened to put Kathy in a condition in which her mother would not recognize her unless Kathy returned a pickup truck to him.

The transcript of defendant's testimony at his prior murder trial was read to the jury. Defendant in that case testified as to his efforts to locate Kathy and their children. Kathy wrote to him, indicating a possibility of getting back together. He testified if Kathy told him there was no chance of their reconciling, he planned to kill himself in front of her. On the morning of the killing he drank a tall can of beer and took three or four codeine pills. He went to his daughter's school with a loaded gun in his pocket. He remembered getting in the car and Kathy screaming, but did not remember shooting her. The next thing he recalled was being down the driveway with his daughter and hearing his son calling to him.

### 2. *Murder of Cheryl Renee Wright*

The prosecution presented evidence showing defendant murdered Cheryl Renee Wright on August 10, 1980. Beverly Johnston, Wright's mother, testified she spoke with Wright at 6:30 p.m. that day. Wright was then at her sister Rhonda's house in Sacramento. Rhonda testified Wright left to return to her apartment in Redding around 7:15 or 7:30 p.m., dressed in a wine-colored strapless jumpsuit in a flowered pattern. She had no more than $50 with her. Johnston attempted to reach Wright in Redding at 10 p.m. Wright's boyfriend, Randy Orum, was waiting there for her. Wright had called him at the apartment around 8 p.m. and again within the hour. Johnston called Wright's apartment again around midnight and still later, at 2 a.m., and then called the highway patrol.

Around 9 p.m. two employees of a service station in Williams saw defendant drive into the station in a light-colored Camaro. He was with a girl identified as Wright. She made several phone calls and changed her clothes. Defendant discussed with the service station employees how to fix the tire on her Vega. Defendant had previously been seen at the station driving a brown and tan pickup truck with an Oakland Raiders sticker. Defendant and Wright discussed towing her car. He claimed he had a friend about six miles out in the country who had a Vega, and that he could get two tires and wheels so she could get her car fixed. The tow service operator had been in the area for 22 years and knew almost everyone; according to him, no one in the area owned a Vega. When defendant left the station, he drove toward the northbound I-5 ramp, which also led to Highway 20.

Wright's Vega, with a badly damaged rear tire and low left tire, was found north of Williams at 2:40 a.m. on August 11, 1980.

On August 17, 1980, Wright's body was found buried under gravel at an abandoned oil well on Bear Valley Road off Highway 20. She had died as a

result of a head wound inflicted by a .25-caliber bullet fired from a semiautomatic pistol. Death had occurred between two days and two weeks earlier; the exact time of death could not be determined due to deterioration of the body.

Police collected samples of the gravel that covered the body and of the gravel that covered the floorboards on the driver's side of the Camaro defendant was driving on August 10. John Rapp, a geologist for the California Division of Mines and Geology and a specialist in rock identification, examined the samples and concluded the gravel from the well site and the gravel from the Camaro were virtually identical. He testified that kind of gravel was not indigenous to Colusa County, being native only to Southern California. The gravel at the well site and in defendant's car matched a kind of gravel dug in Bakersfield and delivered to the mine by Coastal Engineering Company of Bakersfield in May 1979. Coastal Engineering Company had never delivered gravel from that source anywhere else north of Sacramento.

During the search of Mrs. Stanley's house police found .25-caliber ammunition in the bedroom defendant had used, as well as in the garage and master bedroom.

3. *Other Uncharged Offenses Involving Violence or Threat of Violence*

During the guilt phase the prosecution introduced evidence that on or about July 20, 1980, defendant committed arson of Cindy's automobile. Defendant was not charged with arson, but during the penalty phase the prosecutor argued it as a circumstance in aggravation, and the jury was instructed on the elements of arson.

P., Kathy's sister, testified defendant raped P. at gunpoint in the house he shared with Kathy in spring 1974. He then watched P. while she bathed and told P. he would kill Kathy if she told anyone what he had done. Later, defendant attempted to rape P. in her car. She managed to escape, naked from the waist down. P. also testified regarding an earlier occasion when defendant had vandalized her family's car.

James Rhiley, Kathy's father, testified that in the summer of 1969, after he ordered defendant off his property, defendant threatened him with violence.

Linda Faith testified that in October or November of 1965 defendant fired a shotgun at a neighbor's door in response to the neighbor's refusal to turn down his stereo.

Barbara Gwiazdon testified defendant called her in October 1969 and threatened bodily injury to her family if they evicted his parents from their rental house. He warned her not to leave her house alone or to leave her cars out.

Claudia Ameral testified that in the summer of 1970 she heard defendant threaten to kill his sister-in-law. At that time Ms. Ameral and her husband owed defendant money. Defendant made a series of telephone calls threatening them with physical violence, death and destruction of their house, unless they paid the debt.

Everett Downing, a neighbor of defendant, testified that in the fall of 1971 defendant asked him to come to his house to discuss some rubbish on defendant's lawn. When Downing knocked at the door, defendant emerged, pulled off his shirt, and wanted to fight. He also threatened to burn Downing's camper.

### 4. *Mitigating Evidence*

Defendant's mother testified about defendant's childhood, including the surgeries performed on his deformed lip and nose and his commitment to the California Youth Authority. She also testified about his love for his children and her love for him.

Judy Alleman, defendant's sister, Phillip Alleman, defendant's brother-in-law, and Todd, Kristie and J.J., defendant's children, testified they loved defendant and he loved them.

It was stipulated that, if called to testify, Bobby Martinez, defendant's cellmate for 10 months in the Lake County jail, and Tom Landrum, defendant's cellmate for several months, would testify defendant was a pleasant companion and they considered him a friend.

It was further stipulated that testimony given at defendant's 1975 trial by three psychiatrists and by four Stanley family members could be read to the jury. Pursuant to the stipulation, the testimony of Dr. Leoti Thompson, a psychiatrist who had interviewed defendant on four occasions, both before and after Kathy Stanley's murder, was read to the jury. Dr. Thompson opined defendant might have been unable to premeditate or deliberate due to his mental state at the time of the murder. Dr. Thompson diagnosed defendant as a passive dependent individual suffering an anxiety reaction with considerable underlying anger and depression.

The testimony of Dr. Martin Blinder was also read to the jury. Dr. Blinder testified to defendant's dependency on his family. His longing for his family

after he and Kathy separated probably caused internalized anger that deepened his depression and made him suicidal. Dr. Blinder did not believe that on the morning of the crime defendant had the power to reason in a normal fashion, although he acknowledged it was possible defendant had consciously intended to kill Kathy.

Forensic psychiatrist Dr. Charles Morris testified he was retained by the district attorney to examine defendant only hours after the 1975 murder. He deliberately interviewed defendant without knowing any details of the offense. He concluded defendant was sane, with no aberrations in his ability to formulate plans and to put them in action. Dr. Morris diagnosed defendant as having a dyssocial reaction and moderate reactive depression. In his opinion defendant was lying when he said he had no memory of the actual shooting.

The testimony of defendant's sister, brother-in-law, mother, and older son was read into the record. All described the extent of defendant's beer drinking; his mother additionally testified to his use of prescription drugs (codeine, Percodan, and Valium).

Captain Wood, Butte County jail commander, testified he had contact with defendant on a regular basis and considered him a model prisoner. On cross-examination he acknowledged defendant was housed not with the general population, but in a single cell with a separate recreation area.

The last defense witness was Dr. David Axelrad, a psychiatrist. Dr. Axelrad interviewed defendant and his family; read police, defense, and prosecution investigation reports, prison records, prior psychiatric reports, and medical records; and reviewed the transcript of the 1975 murder trial. Dr. Axelrad's testimony was illustrated by 12½ hours of videotaped interviews he conducted with defendant. During the course of the interviews Dr. Axelrad injected defendant with sodium amytal, a substance that enhances a subject's willingness to talk (although not affecting the truthfulness of what he says). Dr. Axelrad believed if defendant had been able to provide any further information about Cindy's death, he would have done so under the influence of sodium amytal; as he did not, Dr. Axelrad concluded defendant was not feigning mental illness. In Dr. Axelrad's opinion, at the time of the capital crime defendant was suffering from five mental disorders that caused him not to appreciate the criminality of his act: paranoid disorder, intermittent explosive disorder, borderline personality disorder, alcohol intoxication, and abuse of barbiturates and sedatives. Neurological tests revealed no signs of organic brain damage.

## II. Discussion

### A. *Guilt Phase*

#### 1. *Suppression Issues*

Before trial defendant filed a motion to suppress evidence seized from the Camaro and the Stanley residence in Anderson, and from interception of his letters and conversations in the Shasta County jail, among other items. After a lengthy hearing filling 3,500 pages of transcribed oral proceedings, the trial court granted the motion in part and denied it in part. Defendant and the prosecution both petitioned for writs of mandate. (§ 1538.5, subds. (i), (o).) The Court of Appeal consolidated the proceedings for hearing and disposition. On August 14, 1981, the court, in an unpublished opinion, granted in part and denied in part each petition. (Nos. 53398 and 53463.) On July 22, 1982, this court denied defendant's petition for hearing.

##### a. *Law of the Case*

On appeal defendant raises the same search issues he raised unsuccessfully in his pretrial petition for writ of mandate in the Court of Appeal. The issue before us is whether, as the Attorney General contends, further review of the search issues is foreclosed by the doctrine of "law of the case."

As reiterated in *People* v. *Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211] (*Shuey*): " 'The doctrine of the law of the case is this: That where, upon an appeal, the [reviewing] court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal, and, as here assumed, in any subsequent suit for the same cause of action, and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' " ■ The principle applies to criminal as well as civil matters (*ibid.*; see also *People* v. *Medina* (1972) 6 Cal.3d 484, 492 [99 Cal.Rptr. 630, 492 P.2d 686]), and it applies to this court even though the previous appeal was before a Court of Appeal (*Searle* v. *Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434 [212 Cal.Rptr. 466, 696 P.2d 1308] (*Searle*)).

The principal reason for the doctrine is judicial economy. "Finality is attributed to an initial appellate ruling so as to avoid the further reversal and proceedings on remand that would result if the initial ruling were not adhered to in a later appellate proceeding." (*Searle, supra,* 38 Cal.3d at p.

435.) Because the rule is merely one of procedure and does not go to the jurisdiction of the court (*People* v. *Medina, supra,* 6 Cal.3d at p. 492; see *Clemente* v. *State of California* (1985) 40 Cal.3d 202, 212 [219 Cal.Rptr. 445, 707 P.2d 818]), the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a "manifest misapplication of existing principles resulting in substantial injustice" (*Shuey, supra,* 13 Cal.3d at p. 846), or the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations (*People* v. *Ramos* (1984) 37 Cal.3d 136, 146 [207 Cal.Rptr. 800, 689 P.2d 430] (*Ramos*)). The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination. (*Shuey, supra,* 13 Cal.3d at p. 846.)

Defendant argues that this court's constitutional duty to review all judgments of death to ensure there has not been a miscarriage of justice (Cal. Const., art. VI, § 11; see § 1239, subd. (b)) precludes application of the law of the case doctrine to decisions of intermediate appellate courts. (*People* v. *Stanworth* (1969) 71 Cal.2d 820, 832-833 [80 Cal.Rptr. 49, 457 P.2d 889] [holding a defendant in a death penalty case cannot waive automatic appeal prescribed by § 1239, subd. (b)].)

We have previously resolved this question adversely to defendant's position. (*People* v. *Keenan* (1988) 46 Cal.3d 478, 505-507 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 758-760 [239 Cal.Rptr. 82, 739 P.2d 1250].) *People* v. *Stanworth, supra,* 71 Cal.2d 820, on which defendant relies, is distinguishable in that our focus there was on a death penalty defendant's automatic right of review, not on which appellate court should provide the review. (See *Stanworth, supra,* 71 Cal.2d at pp. 832-834.) Indeed, we have applied the doctrine of law of the case in two death penalty cases not readily distinguishable from this one. (*People* v. *Keenan, supra,* 46 Cal.3d at pp. 505-507 [according law of the case effect to Court of Appeal decision denying capital defendant's petition for mandate to compel discovery]; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 758-760 [according law of the case effect to Court of Appeal decision denying relief from trial court's denial of motion to sever counts (§ 954)]; see also *People* v. *Mattson* (1990) 50 Cal.3d 826, 850, fn. 9 [268 Cal.Rptr. 802, 789 P.2d 983] [dictum].)

Consequently, that this is a capital case does not bar application of the law of the case doctrine to the search issues. Absent a "manifest misapplication" of the law resulting in "substantial injustice" (*Shuey, supra,* 13 Cal.3d at p. 846) or an intervening change in the law (*Ramos, supra,* 37 Cal.3d at p. 146), the Court of Appeal decision should stand as the law of the case.

## b. *Issues Decided*

The Court of Appeal upheld the search of the Camaro and the search of the Stanley home, including the parole search of Stanley's room.[4] The court also upheld the search of defendant's mother's pickup, the interception of defendant's jailhouse mail and communications with visitors, and the search and seizure pursuant to warrant of evidentiary samples from defendant's body, but no evidence from these latter searches was admitted at trial. Finally, the court held invalid the June 1974 warrant search of defendant's home and pickup truck, during which police had seized (but later returned) the same Marlin .30-.30 rifle that was seized in the trunk of the Camaro and entered into evidence as People's exhibit No. 28. Consequently, the jury was not permitted to know that the rifle had been in defendant's possession six years earlier.

Defendant makes the same challenges to the approved searches as were disposed of by the Court of Appeal. Therefore, unless the Court of Appeal opinion rests on a "manifest misapplication of existing principles resulting in substantial injustice" (*Shuey, supra,* 13 Cal.3d at p. 846), or there has been an intervening determination altering the controlling rules of law (*Ramos, supra,* 37 Cal.3d at p. 146), that court's decision should be law of the case. As noted above, our mere disagreement, if any, with the Court of Appeal's determination is not of itself a sufficient basis for finding the decision unjust. (*Shuey, supra,* 13 Cal.3d at p. 846.)

The Court of Appeal opinion does not disclose a "manifest misapplication of existing principles resulting in substantial injustice" such as would justify reexamination of the issues decided. *People v. Scott* (1976) 16 Cal.3d 242, 247 [128 Cal.Rptr. 39, 546 P.2d 327], cited by defendant, is distinguishable. There the Court of Appeal purported to apply one of this court's decisions, but in fact misunderstood and misapplied the case. Here the authorities relied on by the Court of Appeal fully support its conclusions. Indeed, although defendant argues the court erred, he does not attempt to bring any asserted error within the standard of "a manifest misapplication of existing principles" (*Shuey, supra,* 13 Cal.3d at p. 846).

Defendant contends, however, that in upholding defendant's arrest at the Stanley home, the Court of Appeal misread the record. In applying the

---

[4]In connection with its decision, the Court of Appeal upheld the validity of the search warrants used in the August 13 search of the Camaro by Lake County authorities, the August 20 search of the Camaro by Colusa County authorities, and the August 21 search of the Stanley home. With respect to the latter two warrants, the court did not rule on the merits but, rather, refused to consider defendant's contentions because of his failure to provide any citation to the record or to relevant authority. Defendant likewise fails in the instant appeal.

doctrine of inevitable discovery, the Court of Appeal stated the trial court found that police would have looked for defendant at his mother's house irrespective of the allegedly illegal prior search for him at his sister's house. According to defendant, the trial court did not so find because the prosecution never asked it to.

Defendant's assertion is unsupported by the record. In upholding defendant's arrest, the trial court first stated its belief the officers had properly come by the information that defendant was not at his sister's house. Continuing, the court stated: "But even without that information, I would feel that the other circumstances are intervening and independent. *And the People don't have to rely upon the search [of defendant's sister's residence] as being a basis for proceeding to the [Stanley] residence.*" (Italics added.)

From this the Court of Appeal determined the trial court found "that regardless of the search of Stanley's sister's home, the police independently would soon have sought Stanley where he resided nearby with his mother and son." The Court of Appeal's reading of the record is manifestly reasonable; hence, defendant has failed to demonstrate any reason to justify excepting this part of the court's decision from application of the law of the case doctrine.

### c. *Intervening Change in Law: Parole Search*

At the time of the offense defendant was subject to a general parole search condition.[5] Concurrent with the police search of the Stanley home, defendant's parole agent, John Ransom, conducted a parole search of defendant's bedroom. In upholding the police search, the Court of Appeal, in an alternative holding, relied on defendant's parole condition. (See, e.g., *People* v. *Icenogle* (1977) 71 Cal.App.3d 576, 585 [139 Cal.Rptr. 637] *(Icenogle)*.) Relying on this court's subsequent decisions in *People* v. *Burgener* (1986) 41 Cal.3d 505, 528-529 [224 Cal.Rptr. 112, 714 P.2d 1251] *(Burgener)* and *People* v. *Johnson* (1988) 47 Cal.3d 576 [253 Cal.Rptr. 710, 764 P.2d 1087] *(Johnson)*, defendant argues the Court of Appeal erred.

*Burgener, supra,* and *Johnson, supra,* stand for the principle that a parole search is reasonable under the Fourth Amendment "if there is a reasonable nexus (a direct and close relationship) between the search and the parole process, and a reasonable suspicion, based on articulable facts, that the parolee has violated the terms of his parole or engaged in criminal activity."

---

[5]Defendant had acceded to the condition that he and his residence and any property under his control "may be searched without a warrant by any agent of the Department of Corrections *or any law enforcement officer.*" (Italics added.)

(*Johnson, supra,* 47 Cal.3d at p. 594.) Neither police participation nor the fact the parolee is already under arrest invalidates an otherwise proper parole supervision purpose. (*Ibid.;* see *Burgener, supra,* 41 Cal.3d at p. 536.)

Defendant maintains that because his parole agent was operating independently of the police and did not authorize their search, there was no requisite nexus between the police search and his parole condition. Significantly, he does not argue that if agent Ransom had authorized the police search, it would nevertheless have lacked a proper parole supervision purpose. Clearly, investigation of defendant's involvement in a murder would have a parole supervision purpose. (*Burgener, supra,* 41 Cal.3d at p. 536; see also *People* v. *Brown* (1989) 213 Cal.App.3d 187, 192 [261 Cal.Rptr. 612].)

The question, then, is whether *Burgener, supra,* and *Johnson, supra,* should be applied retroactively to invalidate the Court of Appeal's alternative parole-search theory, based on then-valid law (*Icenogle, supra,* 71 Cal.App.3d at p. 585). *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110] (*Donaldson*) dictates not. In *Donaldson* this court held that in search and seizure cases a decision that represents a clear break with the past generally should not be given retroactive effect. The reason is that exclusion is neither necessary to ensure the reliability of the factfinding process at trial, nor does it deter illegal police conduct; hence retroactivity serves no justiciable purpose. (*Id.* at p. 39.)

Because the Court of Appeal correctly applied the law of parole searches as it then existed, we shall not overturn its alternative holding on that point.

In summary, the Court of Appeal decision is the law of the case, and we decline to address defendant's renewed Fourth Amendment arguments.

2. *Failure to Hold Evidentiary Hearing on Transfer of Venue to Butte County*

■ Defendant contends his conviction and sentence must be reversed because the Lake County Superior Court, having granted the motion for change of venue, abused its discretion in not holding an evidentiary hearing to determine whether Butte County was an appropriate site for trial.

Defendant bases his argument on *McGown* v. *Superior Court* (1977) 75 Cal.App.3d 648 [142 Cal.Rptr. 262] (*McGown*). There the Court of Appeal construed rule 842 of the California Rules of Court impliedly to require the court in which the action is pending to conduct an evidentiary hearing before deciding where the cause should be transferred, while noting parties might

waive their right to present evidence on the issue.[6] (*McGown, supra,* 75 Cal.App.3d at p. 652.) Because the transferring court in *McGown* had ordered the case transferred to Stanislaus County without affording the defense an opportunity to show the existence of prejudicial publicity there, the Court of Appeal issued a writ of mandate to compel the transferring court to hold a hearing to determine whether the case should be transferred to Stanislaus County. (*Id.* at pp. 653-654.)

Defendant's contention fails at the threshold because the Lake County Superior Court did hold a hearing before determining the suitability of Butte County for trial of the case. Before and after granting the motion for change of venue, the court repeatedly indicated its awareness of the need for a hearing. Before holding the hearing, the court solicited counsel's views as to the appropriate county of transfer, and both sides named Butte County as their first preference. Counsel and the court noted certain counties would be impracticable as sites for trial, e.g., Colusa, where the "I-5" murder, one of the other crimes to be presented during the penalty phase, occurred; Contra Costa, where defendant had previously been convicted of murder; and several other Northern California counties affected by defendant's criminal activities. After submitting the proposal for Butte County to the Administrative Office of the Courts, as required by California Rules of Court, rule 842, the court held a hearing, during which it confirmed that all counsel continued to favor Butte County. The court offered counsel the opportunity to raise any other matter relevant to the venue determination. Only then did the court determine the action should be transferred to Butte County.

Defendant contends these proceedings were insufficient and an evidentiary hearing was required. The contention is meritless. All parties agreed there were no factual issues to be resolved before determining the place to which the case would be transferred. Under these circumstances, it is difficult to grasp the point of an evidentiary hearing. Defendant reminds us of the importance of choosing a venue where a fair trial can be had and recites the factors courts must consider in determining venue—the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and the nature and extent of publicity. (See, e.g., *People* v. *Proctor* (1992) 4 Cal.4th 499, 523-528 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) He fails, however, to show

---

[6]The rule provides as follows: "When the court in which the action is pending determines that it should be transferred pursuant to Section 1033 or 1034 of the Penal Code, it shall advise the Administrative Director of the Courts of the pending transfer. Upon being advised the Director shall, in order to expedite judicial business and equalize the work of the judges, suggest a court or courts that would not be unduly burdened by the trial of the case. Thereafter, the court in which the case is pending shall transfer the case to a proper court as it determines to be in the interest of justice." (Cal. Rules of Court, rule 842.)

the parties in this case did not consider those factors. Accordingly, we conclude the court did not err in failing to hold an evidentiary hearing to determine the suitability of Butte County as the trial venue. *People* v. *Cooper* (1991) 53 Cal.3d 771, 804 [281 Cal.Rptr. 90, 809 P.2d 865], cited by defendant, does not assist him, for it merely holds (as relevant here) that the trial court, not the defendant, determines the trial venue.

Defendant's related claim—that his trial counsel was ineffective in not demanding an evidentiary hearing to determine the proper transferee court— consequently must fail as well. He has not shown that trial counsel's performance fell below the standard of reasonable professional competence or that it is reasonably probable a determination more favorable to him would have resulted, in the absence of counsel's asserted shortcomings. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052]; *People* v. *Fauber* (1992) 2 Cal.4th 792, 831 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Nothing in the record suggests, contrary to trial counsel's expressed preference for Butte County, that counsel possessed information indicating a need for an evidentiary hearing. Our scrutiny of counsel's performance is deferential; we will not indulge in speculation that trial counsel might have conducted further investigation that might have led to the discovery of such information. (See *Strickland* v. *Washington, supra*, 466 U.S. at pp. 688-689 [80 L.Ed.2d at pp. 693-694].) Furthermore, nothing in the record hints the choice of Butte County prejudiced defendant. Indeed, in denying a defense motion to sequester the jury at the end of the guilt phase, the trial court commented on the lack of media coverage of the trial in Butte County. Thus, we find neither impropriety in the transfer to Butte County, nor ineffective assistance of counsel in this connection.

3. *Sufficiency of Evidence*

Defendant asserts the record contains insufficient evidence to support his conviction of murder and the jury's findings on the special circumstance allegations. ▇▇ On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781].) The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (*People* v. *Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 461, 760 P.2d 996].) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of

two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" (*Id.* at pp. 932-933.) " 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' " (*Id.* at p. 933, quoting *People* v. *Pierce* (1979) 24 Cal.3d 199, 210 [155 Cal.Rptr. 657, 595 P.2d 91].)

Defendant does not specify how the evidence fails to support the verdict. Instead, he merely refers us to the statement of facts contained in his opening brief, apparently assuming this court will construct a theory supportive of his innocence and inconsistent with the prosecution's version of the evidence. That is not our role. ■ "[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]" (9 Witkin, Cal. Procedure, (3d ed. 1985) Appeal, § 479, p. 469; see also *People* v. *Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *Duncan* v. *Ramish* (1904) 142 Cal. 686, 689-690 [76 P. 661].) This principle is especially true when an appellant makes a general assertion, unsupported by specific argument, regarding insufficiency of evidence. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 479, p. 469.)

■ Nonetheless, we have reviewed the record in light of the standard of review enunciated in the authorities discussed above and find it amply supports the judgment.[7] The evidence indicated defendant possessed the weapon and ammunition used to kill Cindy. Defendant earlier had committed felony offenses against her, for which she had brought a criminal complaint against him. He also had burned down her house and torched her car. Following the murder he fled from a police roadblock. After his arrest he made false statements to account for his whereabouts on the night of the crime. These and numerous other facts presented into evidence warranted the jury in finding defendant guilty of murder and the special circumstances true.

### 4. *Claims of Instructional Error*

#### a. *First Degree Murder by Lying in Wait*

The jury was instructed on the alternative first degree murder theories of murder by premeditation and deliberation and murder by lying in wait. In

[7]We have considered and decline the People's request to strike defendant's sufficiency-of-evidence argument.

connection with lying in wait, the court instructed the jury, in part, "The term, quote, 'lying in wait,' end quote, is defined as waiting and watching for an opportune time to act, together with concealment by ambush or by some other secret design to take the other person by surprise. [¶] The lying in wait need not continue for any particular time, provided that its duration is such as to show a state of mind equivalent to premeditation *or* deliberation." (Italics added.) Defendant argues that either deliberation is an element of first degree murder perpetrated by lying in wait, in which case the jury was wrongly instructed, or, if deliberation is not an element, conviction of first degree murder by lying in wait is a denial of a defendant's constitutional rights.

■ The court did not err in instructing the jury in the disjunctive that the duration of the lying in wait must show either premeditation or deliberation. As we held in *People* v. *Ruiz* (1988) 44 Cal.3d 589, 614-615 [244 Cal.Rptr. 200, 749 P.2d 854], the instruction's disjunctive phraseology is neither inappropriate nor misleading. (See also *People* v. *Hardy* (1992) 2 Cal.4th 86, 162-163 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

Defendant maintains, however, that in classifying nondeliberating murderers the same as those who deliberate their killings, the Legislature has created a "suspect class" that affects a fundamental liberty interest, thus placing on the People the burden to establish a "compelling interest" and demonstrate that the distinctions are necessary to further that purpose. (*People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375].)

Defendant's premise the Legislature has created a suspect class is mistaken.[8] To prove first degree murder of any kind, the prosecution must first establish a murder within section 187—that is, an unlawful killing with malice aforethought. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 465 [194 Cal.Rptr. 390, 668 P.2d 697]; *People* v. *Mattison* (1971) 4 Cal.3d 177, 182-183 [93 Cal.Rptr. 185, 481 P.2d 193]; *People* v. *Hyde* (1985) 166 Cal.App.3d 463, 475 [212 Cal.Rptr. 440].) Thereafter, pursuant to section 189, the prosecution must prove the murder was perpetrated by one of the specified statutory means, including lying in wait, or "by *any other kind* of willful, deliberate, and premeditated killing, . . ." (Italics added.)[9] Lying in wait is the functional equivalent of proof of premeditation, deliberation, and

---

[8]We note that in equal protection analysis, "suspect classes" are not legislatively created, but, rather, are constitutionally determined.

[9]At the time relevant to this case, section 189 provided in pertinent part: "All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable

intent to kill. (*People* v. *Hardy, supra,* 2 Cal.4th at p. 162.) Consequently, treating the two kinds of murder the same is not a violation of equal protection.

Citing *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], defendant argues that classifying murder by lying in wait as first degree murder violates the Eighth Amendment proscription against cruel and unusual punishment, because the penalties for first degree murder (25 years to life and, if special circumstances are alleged, exposure to capital punishment) are disproportionate to the culpability of a murderer who does not deliberate on the offense.

In *Enmund* the high court held that the death penalty, imposed under the state felony-murder rule, was disproportionate punishment for a robber who did not himself kill, attempt to kill, or intend that a killing take place or that lethal force would be employed. (458 U.S. at p. 797 [73 L.Ed.2d at pp. 1151-1152].) More recently, in *Tison* v. *Arizona* (1987) 481 U.S. 137, 158 [95 L.Ed.2d 127, 145, 107 S.Ct. 1676], the court held "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (Fn. omitted.) In light of these pronouncements, defendant cannot prevail in his argument that his conviction for first degree murder violates the Eighth Amendment. "Murder committed by lying in wait has been 'anciently regarded . . . as a particularly heinous and repugnant crime.' [Citation.]" (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1023 [254 Cal.Rptr. 586, 766 P.2d 1].) The moral culpability of the offender who murders by lying in wait justifies fixing the murder in the first degree. (*People* v. *Wolff* (1964) 61 Cal.2d 795, 820 [40 Cal.Rptr. 271, 394 P.2d 959]; see also *People* v. *Morales* (1989) 48 Cal.3d 527, 558 [257 Cal.Rptr. 64, 770 P.2d 244].)

Finally, defendant asserts that if deliberation need not be proved, virtually any premeditated murder can satisfy the requirements of lying in wait and thus be murder in the first degree. He maintains that once the prosecution has proved premeditation, it has, by the same facts, in effect proved lying in wait. This contention is meritless. "Premeditated" simply means " 'considered beforehand.' " (*People* v. *Perez* (1992) 2 Cal.4th 1117, 1123 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) For lying in wait, by contrast, the prosecution must prove the elements of concealment of purpose together with "a substantial period of watching and waiting for an opportune time to act, and . . . immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People* v. *Morales, supra,* 48 Cal.3d at

under Section 288, is a murder of the first degree; and all other kinds of murders are of the second degree."

p. 557 [lying-in-wait special circumstance].) These circumstances, taken together, present "a factual matrix . . . distinct from 'ordinary' premeditated murder . . . ." (*Ibid.*)

### b. *Instructions on Express Malice*

■ The trial court instructed the jury that "the crime of murder is the unlawful killing of a human being with malice aforethought." Pursuant to former CALJIC No. 8.11, the court then instructed as follows: "Malice may be either express[] or implied. *Malice is express[] when there is manifested an intention unlawfully to kill a human being.* [¶] Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base antisocial purpose and with a wanton disregard for human life. [¶] The mental state constituting that malice aforethought does not necessarily require any ill will or hatred of the person killed. 'Aforethought' does not imply deliberation or the elapse [*sic*] of considerable time. It only means that the mental state must precede rather than follow the act." (Italics added.)

Citing *People* v. *Conley* (1966) 64 Cal.2d 310, 320 [49 Cal.Rptr. 815, 411 P.2d 911], defendant asserts the foregoing instruction erroneously informed the jury they must find express malice if they found intent to kill, thereby creating a mandatory presumption in violation of *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]. (See, e.g., *Francis* v. *Franklin* (1985) 471 U.S. 307 [85 L.Ed.2d 344, 105 S.Ct. 1965]; *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450].)

*Conley* is inapposite. There the trial court, in instructing the jury on the elements of murder, instructed on intention, deliberation and premeditation, but omitted any reference to malice. Defendant's defense was diminished capacity. Observing that the mental state of specific intent to kill was not necessarily the same as malice aforethought (64 Cal.2d at p. 320), the court held the instructional omission removed from the jury the issue of defendant's capacity to harbor malice (*id.* at p. 323). Here, by contrast, the jury was fully instructed on malice.

Nor did the instruction erroneously equate malice with intent. When these offenses occurred, "[a]n awareness of the obligation to act within the general body of laws regulating society . . . [was] included in the statutory definition of implied malice in terms of an abandoned and malignant heart *and in the definition of express malice as the deliberate intention unlawfully to take life.*" (*People* v. *Conley, supra,* 64 Cal.2d at p. 322, italics added; see also

*People* v. *Polley* (1983) 147 Cal.App.3d 1088, 1092 [195 Cal.Rptr. 496].)[10] Although an amplifying instruction may have been required if defendant had relied on a diminished capacity defense (*People* v. *Fusselman* (1975) 46 Cal.App.3d 289, 300-301 [120 Cal.Rptr. 282]; see generally, *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1]), defendant's defense of alibi was totally inconsistent with diminished capacity. In the circumstances, the court's instructions were sufficient. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703, 716-717 [112 Cal.Rptr. 1, 518 P.2d 913]; cf. *People* v. *James* (1987) 196 Cal.App.3d 272, 289-291 [241 Cal.Rptr. 691].)

### c. *Instruction on Reasonable Doubt*

Citing *Cage* v. *Louisiana* (1990) 498 U.S. 39 [112 L.Ed.2d 339, 111 S.Ct. 328], defendant contends the use of CALJIC No. 2.90[11] denied him due process of law because the standard instruction impermissibly lightened the prosecution's burden to prove his guilt beyond a reasonable doubt. ■ Specifically, he criticizes the instruction for employing the term "moral certainty," urging it suffers from vagueness and improperly introduces subjective moral and ethical considerations in place of the objective evidentiary concerns on which the law requires the jury to focus. Recently the United States Supreme Court upheld the constitutionality of the instruction. (*Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], affirming *People* v. *Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Although several justices criticized the term "moral certainty," its use in the reasonable doubt instruction does not constitute error. (See 511 U.S. at p. __ [127 L.Ed.2d at pp. 595-596 (maj. opn. by O'Connor, J.); *id.* at p. __ [127 L.Ed.2d at p. 601] (conc. opn. of Kennedy, J.); *id.* at p. __ [127 L.Ed.2d at pp. 601-604] (conc. opn. of Ginsburg, J.); see also *People* v. *Freeman* (1994) 8 Cal.4th 450, 503-504 [34 Cal.Rptr.2d 558, 882 P.2d 249] [holding CALJIC No. 2.90 constitutional].)

### 5. *Denial of Representative and Impartial Jury*

Defendant contends the exclusion of some potential jurors for cause in accord with *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88

---

[10]The offenses in this case occurred before the 1981 amendment to section 22 and the enactment of sections 28 and 29. (See generally, *In re Christian S.* (1994) 7 Cal.4th 768, 775 [30 Cal.Rptr.2d 33, 872 P.2d 574]; *People* v. *Saille* (1991) 54 Cal.3d 1103, 1111-1117 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

[11]CALJIC No. 2.90 defines "reasonable doubt" as follows: "It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." The language of the instruction is drawn from section 1096. If the trial court reads the standard instruction to the jury, by statute no further instruction on reasonable doubt need be given. (See § 1096a.)

S.Ct. 1770] (jurors unalterably opposed to the death penalty) denied him his federal and state constitutional rights to an impartial and representative jury. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) The United States Supreme Court has rejected these contentions (*Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]), as have we (*People* v. *Babbitt* (1988) 45 Cal.3d 660, 679 [248 Cal.Rptr. 69, 755 P.2d 253]).

### B. *Special Circumstance Issues*

#### 1. *Denial of Severance*

 Defendant maintains the trial court erred in denying his motion to sever trial of the witness-murder special circumstance from the guilt phase and to try it with the prior murder allegation already severed. He argues the court's ruling deprived him of the opportunity to present the defense that he killed his wife for a reason other than prevention of her testimony (e.g., "love"), because such a defense would have required him to admit he killed her. Defendant asks this court to rule that when a special circumstance allegation goes to the motive of the charged killing, the defendant is entitled to severance of the allegation.

We decline to adopt the rule defendant suggests. First, in this case defendant did not base his severance motion on the grounds he now advances. Rather, he sought severance to prevent the introduction of evidence concerning the nature of the charges brought by Cindy against him and witnessed by her (rape, forcible oral copulation, corporal punishment) and other prejudicial evidence related to those charges. Before ruling on the severance motion, the court suggested the jury could be informed, through stipulation, that Cindy had charged three felony counts against defendant. The prosecutor agreed to so limit the People's evidence. Then, after weighing probative value and other factors under Evidence Code section 352, the trial court denied the motion for severance. At no time did the defense suggest severance was necessary to permit defendant to present the inconsistent defenses of alibi to the murder charge and of "I killed her for love, not because she was a witness" to the special circumstance allegation.

Second, section 190.1 provides for a unitary trial of the guilt and special circumstance issues, except as therein provided.[12] Although more than half of the statutory special circumstances involve motive (§ 190.2, subd. (a)(1),

---

[12]Section 190.1 provides in pertinent part: "A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows: [¶] (a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall *at the same time* determine the truth of all

(5), (7), (8), (10), (11), (12), (13), (16)), the statute does not except those circumstances from trial at the same time as trial of the issue of guilt. In *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], this court suggested there should be an exception to the simultaneous proceeding called for by section 190.1 when evidence relevant only to a special circumstance "is highly prejudicial," in which case "the court should exclude it at the guilt trial and conduct a separate trial of the special circumstance allegations." (37 Cal.3d at p. 748, fn. omitted.) Barring such "highly prejudicial" evidence, a unitary trial is the rule and severance the exception, to be granted only when the jury's ability to render a fair and impartial verdict on the special circumstances would otherwise be impaired. (*People* v. *Fierro* (1991) 1 Cal.4th 173, 229 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

In the instant case, the allegedly prejudicial evidence of the nature of defendant's charged crimes against Cindy was excluded by stipulation of the parties. The remaining evidence was admissible as relevant to defendant's motive. (Cf. *People* v. *Edelbacher*, *supra*, 47 Cal.3d at p. 1028.) Denial of defendant's severance motion was not an abuse of discretion.

### 2. *Inconsistent Instructions*

Pursuant to CALJIC No. 2.51, the court instructed the jury that "[m]otive is not an element of the crime charged and need not be shown." Pursuant to CALJIC No. 8.81.10, the court also instructed the jury that in determining the truth of the witness-murder special circumstance, they had to determine whether the victim was killed for the purpose of preventing her testimony. Defendant argues that because motive and purpose are synonymous, the two instructions were inconsistent and may have misled the jury to defendant's prejudice.

We rejected a similar contention in *People* v. *Edelbacher*, *supra*, 47 Cal.3d at page 1027. As there stated, "The 'crime charged' was murder and any reasonable juror would have understood the instruction as referring to this substantive offense only and not to any special circumstance allegation." (*Ibid.*; accord, *People* v. *Noguera* (1992) 4 Cal.4th 599, 637 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)

### 3. *Dominant Purpose of the Killing*

Pursuant to the standard instructions, the court instructed the jury that to find the witness-murder special circumstance true, they must find, inter alia,

---

special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree." (Italics added.)

that "the witness was intentionally killed for the purpose of preventing her testimony in a criminal proceeding . . . ." (CALJIC No. 8.81.10.) ■ Defendant contends the court erred in failing to instruct the jury sua sponte that to find the special circumstance true, they must find the *predominant* purpose of the murder was to prevent the victim's testimony. He maintains that if he would have killed Cindy in any event for other reasons, application of the witness-murder special circumstance to impose the death penalty fails to serve the dual goals of retribution and deterrence, in violation of his right to due process and freedom from cruel and/or unusual punishment. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 781-782 [230 Cal.Rptr. 667, 726 P.2d 113].)

Defendant's argument is specious. The trial court correctly instructed the jury in the language of the statute. More is not required. A defendant who kills his victim in furtherance of more than one purpose is not thereby less culpable than one whose crime has a single purpose. So long as one purpose of a defendant was to prevent the victim from testifying against him, the electorate could reasonably conclude that sentencing him to death would fulfill the dual social purposes of retribution for his deed and deterrence of others. Moreover, a contrary rule would unjustifiably reward defendant for having a criminal ambition greater than one whose killing is motivated only by the desire to eliminate a witness. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 519 [273 Cal.Rptr. 537, 797 P.2d 561].)

*Riley* v. *State* (Fla. 1978) 366 So.2d 19 and other Florida cases relied on by defendant are inapposite. In Florida there is no special circumstance directed at murder for the purpose of preventing testimony. One aggravating circumstance, however, that can render a murderer eligible for the death penalty is that the murder was committed "for the purpose of avoiding or preventing a lawful arrest." (See Fla. Stat. Ann. § 921.141.) The Florida Supreme Court found that this circumstance, although concerned primarily with the killing of law enforcement officers, could also validly be applied when the victim was not a law enforcement officer. However, because its application to civilians would invariably arise during the defendant's commission of another felony, to avoid overlap in that instance with Florida's felony-murder aggravating circumstance, the court held "the mere fact of a death is not enough to invoke this factor when the victim is not a law enforcement officer. Proof of the requisite intent to avoid arrest and detection must be very strong in these cases." (366 So.2d at p. 22.) Thus, in *Menendez* v. *State* (Fla. 1979) 368 So.2d 1278, 1282, involving a store owner killed during a robbery, the court held that for the aggravating circumstance to apply, it must clearly be shown "the dominant or only motive" for the murder was the elimination of witnesses. (Accord, *Herzog* v. *State* (Fla.

1983) 439 So.2d 1372, 1378-1379 [no evidence of previous crime to which victim was a witness].)

Like Florida, this court also has determined that it is appropriate to construe special circumstances in such a way as to minimize the application of multiple special circumstances arising out of the same conduct. (*People* v. *Bigelow, supra,* 37 Cal.3d at p. 751.) Unlike Florida, however, the California witness-murder special circumstance expressly excludes a killing committed during the commission of the crime to which the victim was a witness. (§ 190.2, subd. (a)(10); see *People* v. *Garrison* (1989) 47 Cal.3d 746, 792 [254 Cal.Rptr. 257, 765 P.2d 419]; *People* v. *Silva* (1988) 45 Cal.3d 604, 631 [247 Cal.Rptr. 573, 754 P.2d 1070].) Hence, the reason for Florida's "dominant purpose" rule does not exist. When the reason fails, so should the rule. (See Civ. Code, § 3510.)

The elements of the witness-killing special circumstance are: "(1) a victim who has witnessed a crime prior to, and separate from, the killing; (2) the killing was intentional; and (3) the purpose of the killing was to prevent the victim from testifying about the crime he or she had witnessed." (*People* v. *Garrison, supra,* 47 Cal.3d at p. 792.) If the defendant intentionally kills a would-be witness for the purpose of preventing the victim from testifying in a criminal proceeding, it is not a defense to the special circumstance allegation that he had another purpose as well. (*People* v. *Sanders, supra,* 51 Cal.3d at p. 519.)

### C. Competency Trial

#### 1. Background

During the penalty phase of trial, after the prosecution had presented its case and in the course of the defense case, the trial court suspended proceedings under section 1368, subdivision (b)[13] and ordered a trial on the issue of defendant's present mental competence, pursuant to section 1369.[14]

The issue of defendant's possible incompetency arose when defendant refused to waive his attorney-client, psychotherapist-patient and Fifth

---

[13]Section 1368, subdivision (b) provides in relevant part: "If counsel informs the court that he believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Section[] . . . 1369."

[14]Section 1369 provides for the appointment of one or two psychiatrists or psychologists to examine the defendant and sets forth the order of proceedings at the trial of the issue of the defendant's mental competence. The section concludes: "It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent. The verdict of the jury [in a jury trial] shall be unanimous." (*Id.,* subd. (f).)

Amendment privileges to allow the testimony of Dr. David Axelrad and the admission into evidence of 12½ hours of videotaped hypnotic and narcohypnotic interviews conducted by Axelrad.

Defendant's counsel decided belatedly to use this evidence, originally believing they would not, with cocounsel Petersen and defendant having favored using it and counsel Neill having taken a contrary position. On the sixth day of the prosecution's penalty case, both counsel concluded the evidence was critical to defendant's case in mitigation. Defendant had expressed his preference for life over death. In light of the overwhelming aggravating evidence against defendant, both defense attorneys believed the testimony would provide his only chance for leniency, as the tapes would permit the jury to see him talk openly and with feeling about many subjects, and to appreciate the relationship between his lifetime of rejection and his resultant violence.

Defendant gave various reasons for his refusal to waive the privileges, both personally to the court and through his attorneys. These included that he had originally assumed that Dr. Axelrad would testify concerning his drug and alcohol use, but not under the assumption he was guilty or had mental problems consistent with guilt. Defendant did not want his mental problems and his adverse comments about his mother and other relatives to become part of the public record for his children to see. He was also concerned certain incidents discussed in the tapes would have an adverse effect on the jury and would incriminate him in other matters. The adverse information included acts of violence against his parents (stabbing his father and attempting to choke his mother), the rape of Cindy, and the mysterious disappearance of his third wife, Diana Lynn.[15] Defense counsel told the court defendant had expressed less rational concerns to them. These included retaliation against his attorneys for calling his mother as a witness in the penalty trial, not wanting to be present in court while the tapes were played because he was self-conscious, wanting the proceedings to be over so he could visit with his older son before he left for college, and retaliation against his attorneys for their failure to intervene in his custody battle for his two younger children, who were with their maternal grandparents.

On August 18, 1983, defense counsel for the first time informed the court they thought defendant might be mentally incompetent to rationally assist

---

[15]Diana Lynn was defendant's third wife. Her whereabouts apparently have never been established. Linda Faith was defendant's first wife. Kathy Rhiley, the victim of defendant's prior second degree murder conviction, was defendant's second wife. Cindy Rogers, the victim in the instant case, evidently was defendant's fourth wife.

counsel as provided in section 1367.[16] (Only three days before, counsel had informed the court that, although defendant was not cooperating with them in relation to the presentation of Dr. Axelrad's testimony, they agreed he had the capacity to cooperate and was not "1368.") On August 26, 1983, after hearing the in camera testimony of Dr. Axelrad, the court found a prima facie case had been established that defendant was incompetent. The court ordered proceedings suspended for a section 1368 competency hearing.

At the commencement of the competency proceedings, the court appointed two psychiatrists to examine defendant. Thereafter, pursuant to defendant's objections to the appointed psychiatrists, the court vacated its prior appointments and permitted the prosecution and defense each to nominate a psychiatrist. After defendant initially objected to the competency hearing but thereafter withdrew his objection, the trial court asked whether he wished the court to appoint an attorney to represent him, either in conjunction with his present counsel or without his present counsel. Defendant stated he wished the court to appoint counsel to serve with his present counsel. The trial court, without objection, thereupon appointed Attorney Blake to serve in connection with the competency proceedings, in addition to defendant's other counsel.

The competency trial was by jury. Evidence was presented in three phases. In the first phase, defense counsel Petersen presented evidence of defendant's incompetence. Cocounsel Neill and Dr. Axelrad testified and the videotapes of defendant's interview with Axelrad were played for the jury. In the second phase, Attorney Blake presented evidence of defendant's competence. He called two witnesses, jailer Randy Smith and defendant's former cellmate Bobby Martinez. In the third phase, the prosecution presented the testimony of the two court-appointed psychiatrists selected by the opposing parties and the testimony of the captain in charge of the Butte County jail. The jury found defendant competent. The penalty trial thereupon resumed.

### 2. *Appointment of Third Attorney*

Defendant maintains the court erred in appointing a third attorney, Mr. Blake, to represent defendant's view he was in fact competent. He

---

[16]As relevant at the time of trial, section 1367 provided in part as follows: "A person cannot be tried or adjudged to punishment while such person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." Section 1367 was subsequently amended in ways not significant for this case. (See Stats. 1992, ch. 722, § 10.)

argues the court thereby created a team of two conflicting lawyers to represent him at the same time, in violation of his due process right to effective representation and his right to equal protection of the laws. According to defendant, the court should have either declared a conflict and substituted a new attorney to represent defendant or recognized there was no true conflict and left defendant's representation entirely to his defense attorneys. In addition, he contends both counsel rendered ineffective assistance during the competency proceedings.

Observing that defendant ultimately allowed his attorneys to present Dr. Axelrad's testimony and to show the videotapes at the penalty trial, the Attorney General contends that all issues related to defendant's competency trial are moot. Distinguishing *Pate* v. *Robinson* (1966) 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836] and *People* v. *Pennington* (1967) 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942], which found denial of a defendant's right to a competency hearing prejudicial per se, the Attorney General observes that here, unlike in *Pate, supra*, and *Pennington, supra*, (1) defendant was granted a full hearing (filling 11 volumes of transcript, most of it in support of defendant's incompetency), and (2) once defendant agreed to cooperate with counsel in admitting the evidence, the sole basis for the competency hearing disappeared. The Attorney General reasons any error in conducting the proceedings was therefore harmless beyond a reasonable doubt.

Although the Attorney General's mootness argument is not without some force, we do not rest our decision on that basis. (Cf. *People* v. *Pennington, supra*, 66 Cal.2d at p. 521 [error in denying competency hearing not curable by retrospective determination of defendant's mental competence during trial]; see also *People* v. *Hale* (1988) 44 Cal.3d 531, 541 [244 Cal.Rptr. 114, 749 P.2d 769].) Rather, we reject defendant's argument the court's options were limited to the stated choices.

 Once the accused has come forward with substantial evidence of incompetence, due process requires a full competency hearing be held. (*Pate* v. *Robinson, supra*, 383 U.S. at p. 377 [15 L.Ed.2d at pp. 817-818]; accord, *People* v. *Pennington, supra*, 66 Cal.2d 508, 516-518.) Because in that circumstance there has been a prima facie showing of incompetence, the attorney representing the defendant is required to "advocate the position counsel perceives to be in the client's best interests even when that interest conflicts with the client's stated position." (*Shephard* v. *Superior Court* (1986) 180 Cal.App.3d 23, 28 [225 Cal.Rptr. 328] (*Shephard*); see also *People* v. *Hill* (1967) 67 Cal.2d 105, 115, fn. 4 [60 Cal.Rptr. 234, 429 P.2d 586].) Thus, when counsel believes his client may be incompetent, and the trial court, pursuant to section 1368, has declared a doubt of defendant's

competence, defendant is not deprived of effective assistance if defense counsel overrides defendant's desire to present only evidence and argument of competence. (*Shephard, supra,* 180 Cal.App.3d at p. 29; *People* v. *Bolden* (1979) 99 Cal.App.3d 375, 379-380 [160 Cal.Rptr. 268] (*Bolden*); see also *People* v. *Masterson* (1994) 8 Cal.4th 965 [35 Cal.Rptr.2d 679, 884 P.2d 136].)

In *Shephard, supra,* the Court of Appeal held the trial court erred in relieving defense counsel and appointing private counsel to represent defendant at the competency hearing because defendant had indicated he wished to be found competent. Rather, the court approved the procedure in *Bolden, supra,* 99 Cal.App.3d 375, where counsel allowed defendant to testify as to his own present competence, then presented evidence of incompetence. (*Shephard, supra,* 180 Cal.App.3d at pp. 28-29.) "Allowing a defendant to compel his counsel to argue competency (and suppress contrary evidence) would . . . be increasing the danger of a prima facie incompetent defendant subjecting himself to a guilty verdict at a trial where there is substantial likelihood that he would be unable to assist his counsel in a rational manner." (*Id.* at p. 30.)

In *People* v. *Stankewitz* (1982) 32 Cal.3d 80 [184 Cal.Rptr. 611, 648 P.2d 578] (*Stankewitz*), however, this court recognized there may be situations when appointment of substitute counsel could avoid the necessity for a competence trial. In that case, as here, defendant and counsel had a fundamental disagreement as to trial tactics. Although the court-appointed psychiatrist testified to defendant's mental disorder and further opined that due to his fixation upon the public defender, defendant might be able to rationally assist private counsel, the trial court refused either to conduct a competence trial or to appoint substitute counsel. We recognized that, in the particular circumstances, a substitution of counsel might have avoided altogether the necessity for ordering a full competency hearing. Because the court had done neither, denial of a competency hearing required reversal. (*Id.* at p. 94.)

Here, as in *Stankewitz, supra,* defendant's asserted incompetence manifested itself in a fundamental disagreement with counsel about trial tactics. Unlike in *Stankewitz,* however, the court afforded defendant a full competency hearing. And unlike in *Shephard, supra,* 180 Cal.App.3d 23, the court, notwithstanding defendant's contrary wish, permitted defense counsel to present the case for incompetence in the belief it was in defendant's best interests. That the court, without objection, acted further to protect defendant's interest by appointing an additional attorney to represent defendant's personal point of view did not deprive defendant of due process or the effective assistance of counsel. Defendant's contrary argument is premised

on the false belief a defendant in a competency proceeding has only one interest—to be found incompetent. However, unlike a criminal defendant, whose legal interest lies in being found not guilty whether he is guilty or not, the defendant in a competency proceeding has not only the right not to be tried for a criminal offense when he is incompetent; he has an equally important interest in not being sent to a mental institution with his criminal case unresolved, if he is competent. (See generally, § 1370, subd. (a)(1); *People* v. *Mayes* (1988) 202 Cal.App.3d 908, 915, 917-918 [248 Cal.Rptr. 899].) The appointment of Attorney Blake served this latter interest.[17]

The trial court was presented with a complex situation involving a fundamental disagreement between defendant and counsel concerning the presentation of mitigating evidence, which conflict prompted counsel to state the belief defendant might not be capable of rationally assisting in his defense within the meaning of section 1367. Although the court was required as a matter of law to hold a competency hearing once Dr. Axelrad made a preliminary prima facie showing of defendant's incompetence (*Stankewitz, supra*, 32 Cal.3d at p. 93), because the root of the problem was defendant's refusal to permit mitigating evidence, the issue was far from clear. Thus, in *People* v. *Guzman* (1988) 45 Cal.3d 915, 964-965 [248 Cal.Rptr. 467, 755 P.2d 917], we held a defendant's refusal to present mitigating evidence and his preference for death is not by itself substantial evidence of incompetence requiring the trial court sua sponte to order a competency hearing. Further, in *People* v. *Lang* (1989) 49 Cal.3d 991, 1029-1033 [264 Cal.Rptr. 386, 782 P.2d 627], we expressly recognized a defendant's refusal for personal reasons to permit counsel to present mitigating evidence is entitled to respect. (See also *People* v. *Howard* (1992) 1 Cal.4th 1132, 1163, 1185 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

To accept defendant's argument the appointment of Attorney Blake interfered with his "real" rights under section 1368, or somehow negated the efforts of Attorney Petersen or detrimentally affected the "appearance of the defense team," would be to prejudge the issue of his competence. The defendant is presumed to be competent. (§ 1369, subd. (f); *People* v. *Medina* (1990) 51 Cal.3d 870, 881-885 [274 Cal.Rptr. 849, 799 P.2d 1282].) In appointing separate counsel to represent defendant's point of view, the trial court acted to resolve a conflict, not create one. In so doing it permitted the jury to hear every side of the issue of defendant's competence, thereby

---

[17]We therefore reject defendant's claim that Attorneys Neill and Petersen rendered ineffective assistance by not objecting to Blake's appointment. We further conclude Blake was not ineffective in presenting evidence of defendant's competency rather than standing mute or assisting Attorney Petersen in trying to establish defendant's incompetency.

assuring defendant a fair trial.[18] In the circumstances, defendant perhaps got more than he was entitled to. But we are unable to conclude he thereby was denied due process.[19]

Defendant's cryptic argument the appointment of Attorney Blake denied him equal protection of the laws is equally meritless. Defendant seems to contend that, because there is no other reported case in which a trial court, in section 1368 proceedings, appointed additional counsel for a criminal defendant who differed with defense counsel regarding his own competency, he was disadvantaged compared with other similarly situated defendants. His equal protection claim depends on the argument the trial court erred in appointing Attorney Blake. As we have rejected that argument, we perforce reject his equal protection claim.

### 3. Number of Jury Challenges

Defendant argues the court erred in failing to accord both defense attorneys, Mr. Petersen and Mr. Blake, 26 peremptory challenges each, as was required in capital cases at the time of this trial. (Former § 1070, repealed by Stats. 1988, ch. 1245, § 30; see now Code Civ. Proc., § 231, subd. (a) [providing for 20 peremptory challenges for each side in criminal cases punishable by death or life imprisonment].) This argument is meritless.

"A proceeding to determine the mental competence of a criminal defendant to stand trial pursuant to . . . section 1368 is a special proceeding civil in nature." (*People* v. *Superior Court* (*McPeters*) (1985) 169 Cal.App.3d 796, 798 [215 Cal.Rptr. 482], citing *People* v. *Hill, supra,* 67 Cal.2d at p. 114; see also *People* v. *Fields* (1965) 62 Cal.2d 538, 540 [42 Cal.Rptr. 833, 399 P.2d 369, 16 A.L.R.3d 708].) Consistent with this view, this court has held the parties in a section 1368 proceeding are entitled only to the number of peremptory challenges provided for in civil trials, even if the underlying offense is punishable by death or life imprisonment. (*People* v. *Lawson* (1918) 178 Cal. 722, 728-729 [174 P. 885].)

---

[18]Defendant's argument the prosecution could adequately present the case for defendant's competence ignores the practical and constitutional impediments to defendant's cooperating with the prosecutor on this issue (e.g., the attorney-client privilege and the Fifth Amendment). Only someone in a confidential attorney-client relationship with defendant would be able to present evidence or cross-examine witnesses based on knowledge gained from defendant himself.

[19]Our determination the appointment of a third attorney did not create a conflict makes it unnecessary to address the argument he did not effectively waive his right to conflict-free representation.

In the instant case the parties and the court discussed the number of peremptory challenges that would be permitted.[20] The court rejected allowing 26, as the proceeding did not involve a finding on a capital offense, but rather was an ancillary proceeding that could arise out of any criminal offense. The court saw its choice as between six or ten challenges, depending on whether the matter was more civil or criminal in nature. With the agreement of the parties, the court decided that because the hearing arose out of a criminal proceeding, 10 challenges would be allowed on each side. Subsequently, Attorney Blake suggested that the situation of the defense, with two counsel representing defendant, was analogous to a trial with two defendants who would sometimes have separate interests, in which case each defense attorney is allowed 10 challenges jointly and 5 separately, and the prosecution is allowed a total of 20 challenges. (Former § 1070.5, subd. (a), repealed by Stats. 1988, ch. 1245, § 31.) The court asked the parties if that would be an acceptable compromise. All three counsel stated it would. The record shows that defense counsel Petersen (with Blake's consent) exercised all 10 joint challenges, along with his own 5. The prosecution exercised only eight peremptory challenges.

We adhere to our decision in *Lawson*, *supra*, that the rule applicable to civil trials applies. Consequently, the defense was granted more peremptory challenges than it was entitled to.[21]

### 4. Sufficiency of Evidence of Competency

■ Defendant urges the jury's finding of competency is not supported by substantial evidence. He relies on *People* v. *Samuel* (1981) 29 Cal.3d 489 [174 Cal.Rptr. 684, 629 P.2d 485] (*Samuel*). In that case the defense presented an impressive array of evidence demonstrating Samuel's present inability either to understand the nature of the proceedings against him or to rationally assist in the preparation and presentation of his defense. (*Samuel*, *supra*, 29 Cal.3d at p. 497.) Five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified to Samuel's incompetency, and four psychiatric reports were admitted into evidence. (*Id.* at p. 498.) Each witness and every report concluded

---

[20]Although defendant states he "moved" for 26 peremptory challenges, the record does not reflect a formal motion. Rather, during a discussion of various procedural aspects of the competency trial, when the court asked for counsel's position on the applicable number of challenges, Attorney Blake stated, "As I understand it, there is no guidance, and perhaps out of an abundance of caution, one should revert back to the number being used in this case, that being 26."

[21]In view of this conclusion, we need not discuss whether defendant waived this issue in light of the agreement of all counsel to the allocation of peremptory challenges. (Cf. *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1168-1169 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

Samuel was incompetent to stand trial. (*Ibid.*) In response, the prosecution offered no expert testimony and only two lay witnesses, neither of whom contradicted any of the defense testimony. (*Ibid.*) The consensus was that Samuel suffered from three mental disorders: chronic schizophrenia, mental retardation, and organic dysfunction, which combined to cause extremely bizarre patterns of thought and speech. (*Id.* at p. 500.) Auditory hallucinations rendered Samuel incapable of attending to surrounding events and conditions. (*Id.* at p. 501.) His comprehension and general fund of information were extremely restricted. (*Ibid.*) In response to inquiry as to why he was in jail, he could give a psychiatrist only a confused and vague idea. (*Ibid.*) Another psychiatrist testified about Samuel's delusions in regard to the criminal process: at one point Samuel declared he would not assist in his defense at all because he would be found guilty and killed by the policemen in court. (*Id.* at p. 502.) He did not know what his attorney was trying to do. (*Ibid.*) Prosecution witnesses merely testified regarding Samuel's escape from Patton State Hospital and his ability to perform routine manual tasks. (*Id.* at p. 503.) We concluded the jury could not reasonably reject the persuasive and all but uncontradicted defense evidence proving Samuel's incompetence to stand trial and, accordingly, reversed his conviction. (*Id.* at p. 506.)

This case is not comparable to the virtually one-sided showing of incompetence found in *Samuel, supra*, 29 Cal.3d 489. The evidence presented in support of defendant's incompetency may be summarized as follows: Attorney Neill testified there was no question defendant understood the nature of the proceedings. The only question was whether he was able to cooperate and, if not, whether the inability was the result of a mental disorder. Neill admitted defendant had been competent throughout the lengthy and complex proceedings, until defendant refused to waive the psychotherapist-patient and attorney-client privileges to permit introduction of the taped interviews between defendant and Dr. Axelrad. Neill believed defendant would almost certainly receive the death penalty unless the jury were able to view the tapes. Because defendant wanted life rather than death, Neill felt there was no rational reason not to use the tapes. Defendant's refusal to allow use of the tapes constituted the sole basis for Neill's opinion that he was incompetent. If defendant waived his privileges and allowed Dr. Axelrad to testify, Neill's opinion would change. Neill acknowledged he himself had previously believed the tapes should *not* be used because they contained matters that might prejudice the jury against defendant.

Dr. David Axelrad testified regarding his lengthy evaluations of defendant through interviews and extensive review of medical and family history and records from prior criminal proceedings and the Department of Corrections.

Dr. Axelrad diagnosed defendant as having five different psychiatric disorders, among which paranoia primarily affected his competency. Twice Dr. Axelrad administered a test to assess defendant's competency to stand trial. The results of the first test marginally supported a competency finding, but Dr. Axelrad believed defendant incompetent. The results of the second test marginally showed incompetency. Test scores depended on Dr. Axelrad's subjective assessment of certain criteria relating to the conduct of criminal proceedings.

In support of defendant's assertion of competency, Attorney Blake presented the testimony of jailer Randy Smith and inmate Bobby Martinez. Smith testified regarding defendant's demeanor and ability to understand jail rules. Martinez testified he and defendant had filed a number of petitions, the preparation of which had required defendant to consult law books.

The prosecution presented the testimony of two court-appointed psychiatrists to establish defendant's competency. Dr. Frederic Whipple testified he examined defendant and found him competent. The examination lasted one and one-quarter hours, within the average for competency examinations. Dr. Whipple reviewed defendant's personal history with him, but examined none of the seven boxes of files and records pertaining to defendant that were delivered to him. Dr. Whipple found defendant suffered from no major mental disorder and exhibited no psychotic mannerisms. Defendant knew he had been convicted and was aware of the possible penalties for his offenses. He understood the functions of the various courtroom personnel. He could not recall specific problems with his attorneys, although he conceded they had disagreed on what was important at the trial. Dr. Whipple saw no suspiciousness of his attorneys on defendant's part.

Dr. Albert French testified he examined defendant for about an hour and arrived at a finding of competency. Dr. French noted defendant had reported Attorneys Petersen and Neill were his best friends and proclaimed great faith in them. Defendant understood the roles of the judge, prosecutor and jury. Defendant denied any hallucinations, delusions or feelings of being controlled by outside forces. He had daydreams, but no dream persistence. He could not concentrate, was forgetful and had repetitive thoughts. Defendant suffered from claustrophobia and took several medications. Dr. French administered an examination testing defendant's ability to recite numbers and months backward and to repeat words. Dr. French also tested defendant's ability to explain proverbs in order to assess his capacity for abstract thought. Based on his examination, Dr. French found no evidence of a mental disorder. The only indication of paranoia noted by Dr. French was that during their interview, defendant did not face him directly, but spoke at

a 90-degree angle. Dr. French opined, however, that a truly paranoid person would not give any information in an interview.

Defendant contends the testimony of Attorney Neill and Dr. Axelrad established his incompetency to stand trial. We disagree. Viewing the evidence in the light most favorable to the jury's findings, as we must (*Samuel, supra,* 29 Cal.3d at p. 505), we conclude the record contains clear and substantial proof, consisting of the expert opinions of Drs. Whipple and French and the lay testimony of Smith and Martinez, to support the jury's finding of defendant's competency.

Defendant disagrees, primarily asserting the testimony of Drs. Whipple and French was legally insubstantial because they admittedly did not review the seven boxes of records provided them, and because each spent only about one hour with defendant before formulating his opinion. Defendant also cites Dr. Whipple's testimony, that he could not "categorically" state defendant was not suffering from paranoia, as demonstrating the insubstantiality of his opinion. We disagree. That Dr. Whipple could not make "categorical" psychiatric diagnoses of defendant as a result of his interview does not mean his testimony on the much more limited question of defendant's competency to stand trial lacked a foundation. Defendant makes no attempt to show the matters on which Dr. Whipple relied were not of the kind normally used by experts in making competency determinations. The failure by Drs. Whipple and French to review the seven boxes of records resulted from defense counsel's apparent failure to narrow the scope of their request to a manageable level. In any event, defendant fails to demonstrate why such review would have been a necessary prerequisite to formation of an expert opinion on the limited issue presented in the competency phase.

Defendant's reliance on *People* v. *Bassett* (1968) 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777] (*Bassett*) is misplaced. In *Bassett* we addressed the issue, entirely distinct from that involved in this case, whether the record contained sufficient evidence of defendant's ability to premeditate and deliberate to support a first degree murder conviction. We reversed the defendant's conviction and sentence, finding the prosecution had not sustained its burden of proof. As to two psychiatrists testifying for the prosecution, who rendered their opinions without having examined the defendant, we held their testimony was insubstantial because they adduced no reasoning in support of their conclusions and never attempted to refute the mass of defense evidence to the contrary. (*Id.* at pp. 144-145.) The opinion of the third psychiatrist, who had personally examined the defendant, did not constitute substantial evidence because his testimony revealed he labored under a misunderstanding of the term "premeditation." (*Id.* at pp. 147-148.) Consequently, the judgment in *Bassett* could not stand.

The testimony of Drs. Whipple and French in this case does not suffer from the same infirmities as did that of the psychiatrists in *Bassett*. Contrary to defendant's contention, the *Bassett* opinion's assertion that " '[m]ore than three or four hours are necessary to assemble a picture of a man' " (69 Cal.2d at p. 142) does not create "minimum interview standards" for this case, which, unlike *Bassett*, involves the limited issue of defendant's competency to stand trial. Other cases defendant cites are factually or procedurally distinguishable. (See *People* v. *Pennington*, *supra*, 66 Cal.2d 508 [defendant was diagnosed as paranoid schizophrenic and experienced fits of psychotic furor during trial]; *People* v. *Aparicio* (1952) 38 Cal.2d 565 [241 P.2d 221] [defendant was psychotic at time of trial, suffering delusions of persecution and hallucinations]; *People* v. *Conrad* (1982) 132 Cal.App.3d 361 [182 Cal.Rptr. 912] [in competency proceeding, both experts testified defendant was psychotic and unable to cooperate with counsel or conduct his own defense in a rational manner]; *People* v. *Tomas* (1977) 74 Cal.App.3d 75 [141 Cal.Rptr. 453] [judgment of conviction reversed for failure to conduct competency hearing]; *In re Newmann* (1976) 65 Cal.App.3d 57 [134 Cal.Rptr. 886] [determining propriety of continued involuntary confinement following finding of incompetency to stand trial due to psychosis and mental retardation]; *People* v. *Melissakis* (1976) 56 Cal.App.3d 52 [128 Cal.Rptr. 122] [judgment of conviction reversed because evidence of defendant's delusions that came to light after pretrial competency hearing and during trial "completely undermined" the earlier finding of competency to stand trial]; *People* v. *Humphrey* (1975) 45 Cal.App.3d 32 [119 Cal.Rptr. 74] [judgment revoking probation reversed for failure to hold hearing on defendant's competency to stand trial in light of evidence defendant suffered from paranoid schizophrenia].)

### 5. *Prosecutorial Misconduct and Motion for Mistrial*

Defendant asserts the trial court improperly denied his motion for mistrial based on alleged prosecutorial misconduct during voir dire. He maintains the court ordered counsel not to voir dire the jury on the penalty phase evidence of the murder of Cheryl Renee Wright (the Colusa County murder), but the prosecutor nevertheless told the jury he intended to show defendant was guilty of committing another murder in Colusa County.

Defendant's premise the court had ordered the prosecutor not to refer to the Colusa County murder in voir dire is mistaken. The issue arose in the context of an extended discussion among the parties and the court concerning how much information the competency-hearing jury should be given for purposes of voir dire. The court's concern was that a full explication of the case against defendant would consume an undue amount of time. Defense

counsel Petersen, presenting the case for incompetence, argued the jury should be given extensive detail, as "this is the time to find out if the prejudicial effect would cause them to not be good jurors." Defense counsel Blake, presenting defendant's personal interest in being found competent, objected to any reference to uncharged criminal activity until the court had ruled on his motion, based on defendant's Fifth Amendment rights, to excise those portions of the videotaped interview with Dr. Axelrad where defendant discussed Cheryl Renee Wright and Diana Lynn. Blake stated Petersen's concern would be moot if the court granted the motion and information about the Colusa County murder was never presented to the jury. The court, however, stated several times it was not going to rule on Blake's motion at that time.

The court suggested that it give the jury the general nature of the proceedings and a brief, undetailed summary of the case against defendant and then allow the attorneys "briefly, to supplement" the summary. The prosecutor asked if there were "any areas that we shouldn't go into?" The only one the prosecutor could think of was the court had indicated it would be more appropriate to say some questions "arose" of defendant's competency, rather than that the defense made the motion. Mr. Petersen stated he could not think of any areas they should not go into for the jury. Mr. Blake stated they should not go into "any matters contained in the audio or video tapes, in which Mr. Stanley made comments about other offense[s] for which he's not charged, for which he still remains subject to prosecution, which, again, is the basis of my motion to exclude such matter from the jury." The prosecutor pointed out there had been a lot of testimony during the penalty phase on the Colusa County murder and suggested "maybe one counsel could just touch on . . . it" without going into detail. Mr. Petersen requested a lengthy statement containing specific details on the circumstances of all three murders: the first degree killing of Cindy Rodgers, the special-circumstance prior murder of Kathy Rhiley, and the penalty phase evidence of the Colusa County killing of Cheryl Renee Wright.

The court responded to Petersen's request by saying, "I don't feel that we should go into that detail at this point in the case." When Mr. Petersen expressed concern that it might emerge belatedly that some of the jurors had been exposed to publicity about one of the murders or were acquainted with the victims or witnesses, the court stated: "What the Court is going to do is to make a rather limited statement as to the nature of the case. And during the course of the jury voir dire, counsel will be given the opportunity to raise certain additional points if you feel that it's necessary. [¶] I will ask that such points be raised, though, as general statements and general inquiries. And not repeat all of the details to each individual juror."

When the court reconvened with the jury panel, the court gave a brief, undetailed summary of the nature of the case, without any indication of the nature of the special circumstances or the evidence in the penalty phase. Mr. Petersen then began a detailed discourse on the nature of the proceedings and the evidence against defendant at his trial, including the special circumstances. As he was giving the details of the penalty phase, he detoured into an explanation of the nature of competency and the position of attorneys in relation to their clients. The prosecutor objected twice on grounds Mr. Petersen was going beyond a simple summary of the nature of the case. Mr. Petersen then quickly concluded, without mentioning the Colusa County murder. Eleven jurors then were empaneled, during which time defense counsel exercised all their peremptory challenges.

Three days later, the court gave its brief summary of the nature of the case to a new panel of prospective jurors. Mr. Petersen then began his supplement to the court's summary. The prosecutor objected on grounds Petersen was getting into a speech. The court admonished Petersen that the purpose "at this point is simply to indicate for this panel . . . the general nature of the case, and it is not intended as an opening statement." Mr. Petersen then asked the court to give the factual background of the case "because . . . [the prosecutor] is sensitive to certain things that [will] come out, and I would like . . . them to come out neutral through the Judge." "[T]here are things necessary that must be said," he stated, "in order to gauge impartiality." The prosecutor responded that he wanted the facts to come out also, and as far as he was concerned, "the Court can relate everything about the proceedings, everything." Mr. Petersen replied, "Then we're in unison."

The court declined to have counsel prepare a stipulated statement, because counsel was capable of stating the necessary additional facts. In response to the court's inquiry, Petersen stated it could take half an hour to explain the nature of the case. When reminded that the explanation had not taken that long during voir dire of the previous panel, Petersen responded that he had had "trouble with [the prosecutor's] objections" at that time. Mr. Blake stated that he joined in Petersen's comments concerning the explanation of the case.

When the prosecutor was asked if he had anything to add to the court's summary, he stated, "I care to add something. I care to tell about the evidence in the penalty phase and what the special circumstances are." Asked by the court how much time that would take, the prosecutor responded, "Oh, probably five minutes, the evidence that was produced by the People." Neither defense counsel objected or asked the court to limit the prosecutor's statement. Nevertheless, the prosecutor added: "I want to be

sure that it's okay with Mr. Petersen because he knows the evidence which the People produced during the penalty phase in those particular areas. [¶] If that's okay, then I'll relate that." Mr. Petersen then objected, but only on the grounds that because he had the burden to establish defendant's incompetence, he "would be the one that would make the opening statement." Admonished by the court that the prosecutor was making a factual summary, not an opening statement, Mr. Petersen made no further objection. The court then stated to the prosecutor, "[I]f you wish, you may proceed."

The prosecutor then proceeded to give a brief summary of the special circumstances and the penalty phase. After stating the nature of the three special circumstances, he turned to the penalty phase. "During the penalty phase," the prosecutor stated, "the People put on evidence to show Mr. Stanley was guilty of committing another murder in Colusa County." At that point defense counsel Blake objected and moved for a mistrial. Petersen joined in the motion.

In a discussion outside the presence of the jury, the court stated its belief they had an understanding "in the selection of the jury as to the first panel" that the Colusa County murder would be omitted and deferred until after defense counsel Blake's motion to exclude the evidence was heard. The prosecutor stated he had no such understanding; that although there was no mention of the Colusa County murder to the first jury panel, he had thought Mr. Petersen was going to mention it, but when he leaned over and asked him, Petersen had said no. The prosecutor had not, however, felt bound by this "informal off the record" exchange. The court denied the motion for mistrial without prejudice to its renewal if the court subsequently granted Mr. Blake's motion to exclude any evidence of the Colusa County murder.

As the foregoing demonstrates, in referring to the Colusa County murder the prosecutor did not violate any order of the court, either express or implicit. If the court had intended to order that the murder not be mentioned, it neglected to do so. There was no prosecutorial misconduct.

### 6. *Claims of Instructional Error*

 Defendant contends the trial court improperly instructed the competency jury. Specifically, defendant argues the jury heard an incorrect definition of incompetency and an erroneous allocation of the burden of proof. As we shall explain, his contentions lack merit.

Just before they retired to deliberate, the trial court instructed the jurors on the issue of incompetency in the following terms, which had been proposed

by defense counsel Neill: "In this proceeding you are to decide whether or not the defendant is mentally incompetent to be tried for a criminal offense. This proceeding is not in any sense a criminal proceeding, and the innocence or guilt of the defendant of the criminal charges against him is not involved nor is the question of his legal insanity at the time of the offense involved. [¶] Penal Code section 1367 provides that: [¶] A person cannot be tried or adjudged to punishment while such person is mentally incompetent. A defendant is mentally incompetent for purposes of this proceeding if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

Defendant now argues the foregoing instruction fails to satisfy the requirements of *Dusky* v. *United States* (1960) 362 U.S. 402, 402 [4 L.Ed.2d 824, 825, 80 S.Ct. 788] (*Dusky*). In a per curiam opinion in that case, the high court observed it is not enough for competency that the defendant is oriented to time and place and has some recollection of events; rather, "the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " (*Ibid.*)

It is true the language of section 1367 does not match, word for word, that of *Dusky*. But as the Court of Appeal noted in *James H.* v. *Superior Court* (1978) 77 Cal.App.3d 169, 177 [143 Cal.Rptr. 398], "To anyone but a hairsplitting semanticist, the two tests are identical."

Defendant complains the instruction given was deficient in not requiring the jury to find him able to understand the nature of the criminal proceedings *against him.* Instead, it merely required he understand the nature of the criminal proceedings. The contention must fail, as defendant suggests no way in which the jury might have been misled. He further argues the instruction was deficient in not requiring the jury to find the defendant " 'comprehends his own status and condition in reference to such proceeding' as required by *Dusky.*" A fair reading of the instruction, however, compels one to conclude the assertedly missing element is implicit. Moreover, preliminary instructions read to the jury at the outset of the competency phase included the phrase "comprehends his own status and condition in reference to such proceeding."[22] Finally, defendant contends in essence the instruction given was deficient because it used the word "rational" only once, rather than twice, as did the *Dusky* formulation. Because defendant does not explain the significance of this asserted deficiency, and because

---

[22]Contrary to defendant's assertion, we find no substantive inconsistency between the preliminary and final instructions.

none appears, we reject the contention. That the jury, during deliberations, asked for a definition of "rationally assist" does not affect our analysis. Defendant fails to persuade us the court erred in giving the instruction based on section 1367.

 Regarding the burden of proof, the trial court instructed the jury as follows: "The defendant is presumed to be mentally competent to stand trial and the one contending the defendant is mentally incompetent has the burden of proving by a preponderance of the evidence that he is mentally incompetent to stand trial."

This instruction departed slightly from the standard instruction, which provides that "[t]he defendant . . . has the burden of proving by a preponderance of the evidence that he is mentally incompetent." While the parties were discussing competency phase jury instructions, defense counsel argued it could not be said *defendant* bore the burden of proving his incompetency, since his position was that he was competent. After negotiations concerning the wording of the instruction, the parties agreed on the version set forth above. Later, in argument, the prosecutor elaborated on the question of burdens, stating the side claiming defendant was incompetent had the burden of proof and noting, "I assume that's represented by Mr. Petersen."

Defendant contends that under *People* v. *Skeirik* (1991) 229 Cal.App.3d 444 [280 Cal.Rptr. 175] the trial court erred in assigning a burden of proof. The *Skeirik* court cautioned trial judges not to rely uncritically on the standard instruction regarding the burden of proving incompetency, reasoning the language of the instruction assumes it will always be the defense that is seeking the finding of incompetency. (*Id.* at p. 459; see CALJIC No. 4.10.) When the prosecution, or the trial court on its own motion, is presenting evidence of incompetency, *Skeirik* teaches that the standard instruction should be modified to inform the jury of the legal standard to apply to the evidence, without allocating the burden of proof to one party or the other. (*Skeirik*, *supra*, 229 Cal.App.3d at p. 460.) Defendant contends the trial court in his case should have declined to instruct the jury that either side bore the burden of proof.

As the People suggest, the *Skeirik* court was primarily concerned with avoiding jury confusion in cases where the evidence for incompetency is presented by someone other than the defendant. Although the trial court here did not anticipate the exact solution proposed in *Skeirik*, we conclude its modification to the standard instruction—assigning the burden of proof to "the one contending the defendant is mentally incompetent"—adequately apprised the jury how to determine the issue in dispute. Defendant was not

forced to shoulder a burden not properly his. Throughout the competency phase it was clear Attorney Petersen was the one presenting evidence of incompetency. Defendant fails to show how the jury might have been misled.

Defendant also urges the requirements of due process forbid imposing on criminal defendants the burden of proving their own incompetency. This argument was rejected in *Medina* v. *California* (1992) 505 U.S. 437, 442-453 [120 L.Ed.2d 353, 368, 112 S.Ct. 2572, 2581]. Defendant argues *Medina* is not controlling because, unlike this case, *Medina* did not involve a situation where the trial court appointed counsel to represent the defendant's position that he was competent to stand trial, even as defense counsel presented evidence of incompetency. Defendant's argument hinges on his claim, which we have already rejected, that the appointment of Attorney Blake created a conflict that vitiated Attorney Petersen's presentation of the case for defendant's incompetency. We see no valid distinction in this respect between *Medina* and this case.

As we have found no error in the conduct of the competency trial, it is unnecessary to address defendant's contention that retrospective evaluation of competency on appeal is improper under California law.

### D. *Penalty Phase*

#### 1. *Admission of Facts Underlying Defendant's Prior Murder Conviction*

Defendant contends the court erred prejudicially in permitting introduction in evidence of the facts and circumstances underlying his prior conviction for the second degree murder of his second wife, Kathy. He maintains that when, pursuant to section 190.3, a prior felony conviction involving a crime of violence is introduced in aggravation of sentence, only the fact of the conviction is admissible, not the details of the offense.[23]

We have repeatedly rejected the identical contention. (E.g., *People* v. *Visciotti* (1992) 2 Cal.4th 1, 71 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Karis* (1988) 46 Cal.3d 612, 639-640 [250 Cal.Rptr. 659, 758 P.2d 1189];

---

[23]Defendant cites the first paragraph of section 190.3, which provides in pertinent part: "In the proceedings on the question of penalty, evidence may be presented by . . . the people . . . as to any matter relevant to aggravation, . . . including . . . the nature and circumstances of the present offense, any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence, [and] the presence . . . of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence . . . ."

*People* v. *Melton* (1988) 44 Cal.3d 713, 754 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301] (*Gates*).) As we explained in *Gates, supra,* "When dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense. Defendant's contention might have had merit had the convictions involved *nonviolent* conduct, since the admission of such evidence is strictly limited by subdivision (c) of section 190.3. But the convictions here involved *violent* conduct and were thus admissible pursuant to subdivision (b) of section 190.3, which permits the introduction of all evidence of violent crimes and does not require a conviction." (43 Cal.3d at p. 1203, italics in original.)

 Defendant argues additionally that permitting evidence of the circumstances surrounding the prior conviction, including evidence suggesting defendant had premeditated and deliberated that murder, allowed the prosecutor to imply, and the jury to infer, that the offense actually was of the first degree.[24] Because the jury's verdict in 1975 of second degree murder impliedly acquitted defendant of first degree murder (*Green* v. *United States* (1957) 355 U.S. 184, 190-191 [2 L.Ed.2d 199, 205-206, 78 S.Ct. 221]; *Stone* v. *Superior Court* (1982) 31 Cal.3d 503, 511 [183 Cal.Rptr. 647, 646 P.2d 809], and cases cited at fn. 5), introduction of evidence suggesting defendant in fact had premeditated and deliberated Kathy Stanley's murder, he asserts, violated his constitutional protection against double jeopardy (U.S. Const., Amends. V, XIV; Cal. Const., art. I, § 15) and the express provisions of section 190.3.[25]

The record does not support defendant's contention. The prosecution neither presented evidence nor argued that defendant was actually guilty of the first degree murder of his second wife. The prosecutorial argument cited by defendant (see fn. 24, *ante*) was made in context of arguing that defendant's threats to his first wife were not "empty words." The court instructed the jury only on the elements of second degree murder in relation to defendant's conviction for killing Kathy and, on agreement of the parties to

---

[24]Defendant points to the testimony of his first wife that, in a telephone conversation with defendant the day after his arrest for his second wife Kathy's murder, during which he threatened to "take care of [her] like he did Kathy," he indicated he "was going to pretend that he was mentally ill and knew how to get away with that with the psychiatrist, and that he would get out in two or three years." From this the prosecutor argued: "So here you have a man who has been arrested. He is already planning to use or manipulate psychiatrists so he could get out in two or three years. And lo and behold he almost makes it—four and a half years for the second degree murder of his second wife, Kathleen."

[25]Section 190.3, third paragraph, provides in pertinent part: "However, in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted."

ensure the jury was not misled, the court specifically told the jury deliberation and premeditation were not elements of the offense. (Cf. *People* v. *Melton, supra,* 44 Cal.3d at pp. 754-755.)

Nor, contrary to defendant's argument, did presentation of the facts and circumstances of the second degree murder conviction require defendant to "run the gantlet" a second time in violation of double jeopardy principles (see *People* v. *Visciotti, supra,* 2 Cal.4th at p. 71; *Ashe* v. *Swenson* (1970) 397 U.S. 436, 446 [25 L.Ed.2d 469, 476-477, 90 S.Ct. 1189]). As we have previously stated: "[O]ne is not placed 'twice in jeopardy for the same offense' when the details of misconduct which has already resulted in conviction and punishment . . . are presented in a later proceeding on the separate issue of the appropriate penalty for a *subsequent* offense. [Citation.] Such a procedure is proper, in our view, even if defendant must thereby endure the 'ordeal' of a second 'trial.' [Citation.] The capital sentencing jury must have the most detailed relevant information about the individual offender. It would be anomalous if jurors could hear the 'gory details' of prior violent crimes with which defendant *had never been charged,* but could consider only cold abstracts of conviction in cases where defendant had been prosecuted successfully." (*People* v. *Melton, supra,* 44 Cal.3d at p 756, fn. 17, italics in original; see *People* v. *Poggi* (1988) 45 Cal.3d 306, 331 [246 Cal.Rptr. 886, 753 P.2d 1082].)

Defendant urges *Taylor* v. *United States* (1990) 495 U.S. 575 [109 L.Ed.2d 607, 110 S.Ct. 2143] (*Taylor*) requires a contrary conclusion. There the high court held that a federal statute, providing for a sentence enhancement in the event a defendant had suffered three prior convictions of certain felonies, as generically listed in the federal statute, precluded the sentencing court from looking beyond the terms of a state statute defining burglary, or the charging document and the jury instructions, to determine whether the defendant's prior conviction in state court met the federal statutory requirements of "generic" burglary. (*Id.* at pp. 600-602 [109 L.Ed.2d 628-629].) Plainly, however, the high court in *Taylor* was interpreting a federal statute, not articulating a federal constitutional standard. *Taylor* therefore does not govern this case. (*People* v. *Wader* (1993) 5 Cal.4th 610, 656, fn. 8 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1243, fn. 14 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

2. *Dual Use of Prior Murder Conviction*

Relying on *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], defendant contends the court erred in instructing the jury it could consider his prior murder conviction as both a special circumstance (§ 190.3, factor (a)) and a prior felony conviction (§ 190.3, factor (c)).

This court's decision in *People* v. *Melton, supra,* 44 Cal.3d 713, undermines the premise of defendant's argument. As we there stated: "We agree that an individual criminal act cannot be counted twice in aggravation *for the same purpose.* However, we see no constitutional obstacle to separate consideration of properly distinct aspects of the penalty determination, even when those aspects happen to coexist in a single incident." (*Id.* at pp. 764-765, italics in original.)

The purpose of the prior-murder-conviction special circumstance is " 'to circumscribe, as the Eighth Amendment requires [citation], the classes of persons who may properly be subject to the death penalty. . . .' . . . And the purpose of factor (c) is to show the capital offense was the culmination of the defendant's habitual criminality—that it was undeterred by the community's previous criminal sanctions. [Citations.] Given these distinct purposes, there is no constitutional impediment to consideration of a defendant's prior-murder conviction under factors (a) . . . and (c)." (*People* v. *Malone* (1988) 47 Cal.3d 1, 46 [252 Cal.Rptr. 525, 762 P.2d 1249]; cf. *Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 245-246 [98 L.Ed.2d 568, 582-583, 108 S.Ct. 546].) The trial court's instruction was not error.

### 3. *Evidence of Uncharged Offenses*

Pursuant to section 190.3, factor (b), permitting evidence of prior criminal activity involving violence or threats of violence, the prosecutor introduced evidence of numerous prior acts of misconduct by defendant.[26] Defendant asserts the introduction of this evidence deprived him of due process and a fair trial.

Defendant first argues adjudication of the uncharged offenses by the same jury that had found him guilty of first degree murder with the special circumstance of a prior murder conviction denied him an impartial decisionmaker. Defendant recognizes we rejected this contention in *People*

---

[26]These acts were as follows: (1) murder (§ 187)—the murder of Cheryl Renee Wright on or about August 10, 1980, in Colusa County; (2) arson (§ 451)—the arson of Cindy Rogers's automobile on or about July 17, 1980, in Trinity County; (3) rape (§ 261)—the rape of P. in the spring of 1974; (4) attempted rape (§§ 261/264)—the attempted rape of P. in 1974; (5) breach of the peace (§ 415)—(a) threatening violence to the person of Jim Rhiley in the summer of 1969, (b) challenging Robert Downing to fight and threatening to burn Downing's camper in the fall of 1971, and (c) threatening to kill the wife of defendant's deceased brother in 1970; (6) brandishing a deadly weapon (§ 417)—firing a shotgun at a neighbor in October or November of 1965; (7) vandalism (§ 594)—malicious damage to the vehicle driven by P. in the summer of 1969; (8) annoying telephone calls (§ 653m)—(a) telephone threats to the life of Linda Faith on January 15, 1975, (b) telephone threats to the life and property of Claudia Ameral in July 1970, and (c) telephone threats of violence to the person and family of Barbara Gwiazdon in October 1969.

v. *Balderas* (1985) 41 Cal.3d 144, 204 [222 Cal.Rptr. 184, 711 P.2d 480] and *People* v. *Allen* (1986) 42 Cal.3d 1222, 1284 [232 Cal.Rptr. 849, 729 P.2d 115]. He urges that we distinguish those cases because in neither did the unadjudicated conduct, as here, consist of a crime—the first degree murder of another female the day before the commission of the capital murder—so closely connected to the capital murder itself. In these circumstances, he maintains, the danger of jury predisposition to find he committed the uncharged murder required a separate penalty jury.

We reject the attempted distinction. Our death penalty statute expressly provides a capital defendant's prior violent conduct is relevant to the penalty determination. That the conduct is closely similar to the capital offense hardly makes it less relevant. "[D]ue process does not preclude the consideration of this type of evidence by a penalty jury which has found the defendant guilty of murder." (*People* v. *Balderas, supra*, 41 Cal.3d at p. 204.) Further, because a new jury would be entitled to hear the circumstances of the capital offense and any special circumstance found true at the guilt trial (§ 190.3, factor (a)), we have determined that "the strong legislative preference for a unitary jury outweighs any 'supposed disadvantage' to defendant in the single-jury process. [Citations.]" (*Balderas, supra*, 41 Cal.3d at p. 204.)

 Defendant alleges the introduction of evidence concerning unadjudicated crimes that occurred between 1965 and 1975 (all but the Colusa County murder and the arson of Cindy Rogers's car; see fn. 26, *ante*) required him to defend against stale acts, in violation of his constitutional rights to due process and a speedy trial and the applicable statutes of limitations.

We have previously rejected the claim that the running of the statute of limitations precludes consideration of time-barred felonious conduct involving violence or the threat of violence as an aggravating factor. (*People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1252 [9 Cal.Rptr.2d 628, 831 P.2d 1210]; *People* v. *Robertson* (1989) 48 Cal.3d 18, 43 [255 Cal.Rptr. 631, 767 P.2d 1109]; *People* v. *Jennings* (1988) 46 Cal.3d 963, 982 [251 Cal.Rptr. 278, 760 P.2d 475].)

Nor is the penalty phase of trial, as defendant suggests, the equivalent of a criminal prosecution for purposes of due process and speedy trial analysis. Evidence of prior unadjudicated violent conduct is admitted not to impose punishment for that conduct, but rather, in part, to give the jury in the capital case "a true picture of the defendant's history since there is no temporal limitation on evidence in mitigation offered by the defendant." (*People* v.

*Jennings, supra,* 46 Cal.3d at p. 982.) As this court noted in *People* v. *Balderas, supra,* 41 Cal.3d 144, 205, footnote 32, the "penalty phase is unique, intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes. Prior violent criminality is obviously relevant in this regard; the reasonable doubt standard ensures reliability; and the evidence is thus not improperly prejudicial or unfair." (Accord, *People* v. *Jennings, supra,* 46 Cal.3d at pp. 980-982.)

Defendant made no objection below nor does he attempt on appeal to show any specific prejudice from admission of the allegedly stale evidence. Any vagueness, as he claims, in the testimony of the witnesses against him concerning the dates of the alleged acts, was a proper subject for cross-examination. Defendant fails to demonstrate unfairness in the proceeding.

Finally, defendant argues the trial court erred in not instructing the jury in the penalty phase that it must be unanimous in a finding that other crimes occurred. We rejected this contention in *People* v. *Ghent, supra,* 43 Cal.3d at pages 773-774. (Accord, *People* v. *Frierson* (1991) 53 Cal.3d 730, 750 [280 Cal.Rptr. 440, 808 P.2d 1197].)

### 4. *Admission of Nonstatutory Aggravating Evidence*

■ Relying on *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782] *(Boyd)*, defendant contends the admission of evidence of certain allegedly noncriminal or nonviolent acts, and of incidents involving violence or threats of violence to property only, constituted prejudicial error.[27]

In *Boyd, supra,* we determined that under the 1978 death penalty law, "Evidence of defendant's background, character, or conduct which is not probative of any specific listed factor would have no tendency to prove or disprove a fact of consequence to the determination of the action, and is therefore irrelevant to aggravation." (38 Cal.3d at p. 774.) We further concluded evidence of violent injury or the threat of violent injury to property is not admissible, as "not of a type which should influence a life or death decision." *(Id.* at p. 776.)

---

[27]Defendant challenges admission of the following incidents: (1) arson (§ 451) of Cindy Rogers's automobile; (2) breaches of the peace (§ 415) by (a) threatening violence to Jim Rhiley, (b) challenging Robert Downing to fight and threatening to burn Downing's camper, and (c) threatening to kill the wife of defendant's deceased brother; (3) vandalism (§ 594) by malicious damage to P.'s vehicle; and (4) annoying telephone calls (§ 653m) by (a) telephone threats to the life of Linda Faith, (b) telephone threats to the life and property of Claudia Ameral, and (c) telephone threats of violence to the person and family of Barbara Gwiazdon.

Defendant acknowledges the arson of Cindy's automobile was properly admitted at the guilt phase (on the issue of identity), but maintains it was improperly considered in aggravation of penalty.

We first observe defendant made no objection to the admission of any of the other-crimes evidence on the ground the evidence did not relate to one of the statutory factors. (See *People* v. *Coleman* (1988) 46 Cal.3d 749, 787 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People* v. *Poggi, supra*, 45 Cal.3d at p. 331.) The argument may therefore be deemed waived. (*People* v. *Poggi, supra*, 45 Cal.3d at p. 331.)

*Boyd*, moreover, is distinguishable. Unlike the act involving property there at issue—the "presumably violent" removal of an air vent's metal grating in an escape attempt (38 Cal.3d at p. 776)—defendant's arson of Cindy's car was an integral part of his attempts to frighten and control her, attempts that commenced with his rape and assault of her on July 16, 1980, that continued with his arson of her house on July 18 and his arson of her car on July 20, and that culminated in his murder of her on August 11. Viewed in this context, the car arson clearly involved an implied threat of violence against a person, as required by *Boyd, supra*, 38 Cal.3d 762, for admission under section 190.3, factor (b). Defendant's threat to burn Downing's camper, made in the context of his effort to get Downing to fight, likewise may be viewed as an implied threat of violence against Downing and thus admissible under factor (b).

 Evidence of the violations of sections 415 and 653m also was admissible under section 190.3, factor (b). In *Boyd, supra*, 38 Cal.3d 762, this court suggested the threats of violence there at issue would have been admissible had the prosecution proved the elements of a criminal offense. (38 Cal.3d at pp. 777-778.) Here the jury was instructed on the elements of sections 415[28] and 653m,[29] and was further instructed to consider the evidence of the alleged threats only if they found beyond a reasonable doubt that defendant had committed the offenses described. That the offenses do not necessarily require acts or threats of violence is immaterial. Section 190.3, factor (b) permits evidence of any offense that in fact "*involved* the use or attempted use of force or violence or the express or implied threat to use force or violence." (Italics added; see *People* v. *Grant* (1988) 45 Cal.3d. 829, 850-851 [248 Cal.Rptr. 444, 755 P.2d 894] [possessing a deadly weapon]; cf. *Boyd, supra*, 38 Cal.3d at p. 777 [inciting to riot].) Defendant's offenses clearly involved threats of violence.

---

[28]The court instructed the jury in pertinent part as follows on breach of the peace: "Every person who unlawfully fights, challenges another person to fight in a public place, [or] who in a public place directs at one or more persons offensive words which are inherently likely to provoke an immediate violent reaction, is guilty of a misdemeanor."

[29]The court instructed the jury in pertinent part as follows on annoying telephone calls: "Every person who with the intent to annoy, telephones another and addresses to or about such other person any threat to inflict injury to the person or the property of the person addressed or any member of his family is guilty of a crime."

Pursuant to the foregoing analysis, all the other-crimes evidence, except the vandalism to P.'s car, was properly admitted. But even assuming admission of the evidence was error, it clearly was nonprejudicial. As properly admitted evidence in aggravation the jury had before it the circumstances of the instant offense—a cold-blooded killing, from a position of hiding, committed in the presence of the victim's parents and 10-year-old child; the 3 special circumstances of prior conviction of murder, murder by lying in wait, and murder for the purpose of killing a witness; defendant's prior conviction of the second degree murder of his wife Kathy Stanley; his murder of Cheryl Renee Wright the day before Cindy's murder; his rape of P.; the attempted rape of P.; and his brandishing a deadly weapon by firing a shotgun at a neighbor. From this evidence the jury would have had to infer that defendant had engaged in a pattern of exceptionally violent behavior over an extended period of time and that he had failed to respond to the rehabilitative efforts of the criminal justice system. Admission of the additional evidence could not have made a difference. (See *People* v. *Burton* (1989) 48 Cal.3d 843, 863-864 [258 Cal.Rptr. 184, 771 P.2d 1270].) Defendant's contention his trial counsel rendered ineffective assistance by failing to object to the evidence accordingly also must fail for want of prejudice. (*People* v. *Zapien* (1993) 4 Cal.4th 929, 981 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

5. *Skipper Error (Skipper v. South Carolina (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669]*

Citing *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954] and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869], defendant contends the court erred in restricting inquiry into whether his family opposed his execution. The issue arose prior to the presentation of certain defense witnesses, when the prosecution asked for an offer of proof as to the relevancy of the testimony of certain members of defendant's family. The prosecutor stated he was making a motion *in limine* to exclude the testimony unless the witnesses had something relevant under the criteria of section 190.3, factors (a) through (k). As an example of a question he considered irrelevant, the prosecutor cited asking defendant's mother "whether she wanted to see him executed." Defense counsel suggested Mrs. Stanley's answer would "indicate something about [defendant's] character and the nature of their relationship." The court stated the question did not appear to be probative of any issue related to the statutory factors and ordered that the question not be asked, but without prejudice to reconsideration of the issue if "any counsel believes that it

would be relevant . . . ." At no time did defense counsel pursue the matter.[30]

In *Lockett* v. *Ohio, supra,* 438 U.S. 586, and *Eddings* v. *Oklahoma, supra,* 455 U.S. 104, the United States Supreme Court held that the Eighth and Fourteenth Amendments require that the "sentencing jury . . . 'not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' [Citations.]" (*People* v. *Easley* (1983) 34 Cal.3d 858, 877-878 [196 Cal.Rptr. 309, 671 P.2d 813], italics omitted.) Here the jury was not precluded from considering such evidence. Defendant's mother testified fully to his background as a youth, his early commitment to the Youth Authority, the ridicule he suffered because of a physical defect requiring corrective surgery, his love for his children and her love for defendant. His sister testified that after defendant's parole from prison in 1979 she observed him encourage his son in sports and express his love for his children. His brother-in-law likewise testified that defendant had expressed love for his children, that defendant had been a pleasant companion on a trip they had taken together, and that he loved him very much. Each of defendant's three children testified to their love for him and his love for them.

From the foregoing testimony the jury would have inferred the obvious—that defendant's family did not want him to be executed. Assuming, without deciding, the court's ruling was error (see *People* v. *Fierro, supra,* 1 Cal.4th at p. 241; but see *Robinson* v. *Maynard* (10th Cir. 1987) 829 F.2d 1501, 1505, cert. denied 502 U.S. 970 [116 L.Ed.2d 463, 112 S.Ct. 445]), it clearly was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; cf. *People* v. *McLain* (1988) 46 Cal.3d 97, 109 [249 Cal.Rptr. 630, 757 P.2d 569].)

### 6. *Prosecutorial Misconduct*

Defendant asserts several instances of error in the prosecutor's closing argument. We discuss his claims in turn, and conclude defendant has not shown error.

### a. *Caldwell error*

■ Citing this court's decisions in *People* v. *Milner* (1988) 45 Cal.3d 227 [246 Cal.Rptr. 713, 753 P.2d 669] (*Milner*) and *People* v. *Farmer* (1989)

---

[30]As the Attorney General argues, the record suggests the idea for the question originated with the prosecution, not the defense. That the defense had not actually planned to ask the question is suggested by the prosecutor's having first stated the question and also by the failure of the defense to accept the court's invitation to take the matter up later.

47 Cal.3d 888 [254 Cal.Rptr. 508, 765 P.2d 940] (*Farmer*), defendant contends his sentence must be reversed under the Eighth Amendment principles articulated in *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (*Caldwell*). *Caldwell* stands for the proposition that a death sentence may not rest on a determination made by a sentencer who has been affirmatively misled to believe the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere. (*Caldwell*, *supra*, 472 U.S. at pp. 328-329 [86 L.Ed.2d at p. 240]; see also *Romano* v. *Oklahoma* (1994) 512 U.S. __, __ [129 L.Ed.2d 1, 11, 114 S.Ct. 2004].) "[S]tate-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court" thus violate the Eighth Amendment and invalidate a death sentence returned under their influence. (*Caldwell*, *supra*, 472 U.S. at p. 330 [86 L.Ed.2d at p. 240].) So also do suggestions that "the law" in the abstract, and not the jurors themselves, determines whether the defendant receives the death penalty. Prosecutorial argument of the latter sort, coupled with a potentially misleading instruction on the jury's sentencing responsibility, caused us to reverse the death sentences imposed in the cases of *Milner*, *supra*, 45 Cal.3d 227, and *Farmer*, *supra*, 47 Cal.3d 888. The prosecutor in *Milner* told the jurors, in summation, essentially that they did not bear personal responsibility for imposing the penalty, they were not required to consider their personal feelings, and "the law" would "protect" them if they avoided doing so. Evaluating the whole record, we concluded the jury was misled as to its sentencing discretion and responsibility; consequently, we reversed the sentence of death. (*Milner*, *supra*, 45 Cal.3d at p. 257.) Similarly, in *Farmer* the prosecutor, during his argument to the jury, declared "Whether or not Mr. Farmer should live or die was decided by the voters of this state when they passed this [death penalty] law, when they set the criteria. They decided who lives and who dies. You decide, does aggravating outweigh mitigating. That is your job. That is all you decide. The law does the rest. . . . You do not decide life or death. The law does that." (47 Cal.3d at p. 929.) We concluded this erroneous statement, among others contained in the prosecutor's closing argument, required reversal of the death sentence. (*Farmer*, *supra*, 47 Cal.3d at pp. 924-931.)

Defendant cites the following portion of the prosecutor's closing argument: "[A]t least 50 or 60 times during Mr. Neill's argument, probably 20 times during Mr. Petersen's argument, they said, 'Are you going to kill Mr. Stanley, are you going to kill him.' Over and over again. Are you going to kill him. Are you going to put the gun to his head. Are you going to pull the trigger. Are you going to kill him. What is the defense trying to do. What are they trying to do? Mr. Stanley is the murderer. The defense wants the jury, you ladies and gentlemen, who have come here, and given of your time, they want you to feel like the murderer. They want you to turn the table, and put

you on the defensive. You are the murderers. If you do what the facts say, if you do what the law says that you should do, if you reach a just result in this case, you then are the murderers. Is that an honest argument? Is that a valid argument? Is that anywhere in these factors? Strictly pandering, playing to some emotion, to turn the tables. And I daresay, ladies and gentlemen, if you are murderers, or killers for returning a verdict of death, then how about the people that are on death row in California, a hundred plus, are the juries who convicted them, are those jurors made up of killers? Every time the death penalty has been on the ballot, 68-70 percent of the people of this state have voted in favor of it. That is the law. And if you are killers, then 68-70 percent of the people in this state are killers in the same regard. If you are killers then the legislature of this state, duly elected representatives throughout the various counties, and districts in this state, those people who have enacted the law of capital punishment, the legislature, they are murderers too, they are killers. The District Attorneys, the prosecutors, they are killers too. And the judge who has to review the death cases, and make determinations, and trial judges, they affirm it, if they affirm it, they are killers too. And the Courts of Appeal in this state, Supreme Court, if they affirm the death penalty cases, under this law, those judges, or justices of the Supreme Court, if they affirm, I guess they are killers too. And if the governor fails to commute a sentence in a death penalty case, I suppose the governor is a killer too." The trial court on its own motion directed the jury to disregard the remark about the Governor.

By failing to object to the prosecutor's comments, defendant failed to preserve the claim of *Caldwell* error. If we were to reach the merits of his argument, we would conclude the jury was not misled to believe the responsibility for determining defendant's sentence lay elsewhere. We do not read the prosecutor's statements as suggesting to the jury that some other agency, such as a reviewing court, was responsible for the sentence to be meted out to defendant. Rather, the prosecutor's remarks were designed to refute the defense's implication that, if the jury voted for death, it would be on the same moral level as a murderer.

Defendant further characterizes other aspects of the prosecutor's closing argument as suggesting the jury could essentially "remove itself" from the decisionmaking process and mechanically weigh aggravating and mitigating factors. We do not so read the argument defendant cites. In our view it falls well within the bounds of propriety.

Defendant notes the prosecutor urged the jury to "weigh the matters that had been presented in aggravation by the People which indicate that death is an appropriate verdict" against "the matters in mitigation, the defense presented . . . and if the aggravation presented outweighs the mitigation, then

your verdict *shall* be one of death." (Italics added.) However, contrary to defendant's claim, the prosecutor's argument did not impermissibly lessen the jurors' sense of responsibility to determine the sentence, but instead paraphrased the relevant portion of section 190.3 in the context of an argument stressing the weighing function the jurors were charged to perform. (See *People* v. *Howard*, *supra*, 1 Cal.4th at p. 1187.) We are mindful of our words of caution in *People* v. *Brown* (1985) 40 Cal.3d 512, 538-541 [220 Cal.Rptr. 637, 709 P.2d 440], that the instruction based on this statutory language, in isolation, has the potential to mislead the jury about its sentencing discretion. Based on our review of the record as a whole, however, we see no reasonable likelihood (*People* v. *Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705]) the jury was so misled in this case.

Defendant also contends the jury's penalty determination is unsupported by substantial evidence. He fails to cite any authority, legal or factual, for that contention, and we therefore are not obliged to address it. Nonetheless, we have reviewed the record and conclude the evidence, outlined above, amply supports the jury's finding that death is the appropriate penalty in this case.

### b. *Griffin Error*

In summarizing the penalty phase evidence, the prosecutor repeatedly referred to the absence of any defense challenge to aggravating evidence of defendant's violent behavior.[31] Defendant contends the prosecutor's comments drew the jury's attention to the fact he did not testify, in

---

[31]Relevant portions of the prosecutor's argument are as follows: ". . . I laid out, and went through each and every one of the matters in aggravation that this jury should consider. And these are the matters that you are to put on that scale to balance it. And I waited and I waited during the defense argument for them to pull out their mitigation that the law says that you can consider to put on their scale. And I waited and I waited and I waited, and I found little, if any, which they brought forth. But you know, that is not surprising. It is not their fault that they couldn't do it. It is not their fault that they had to make an emotional appeal to this jury. But that is what they had. That is all they had. That is all that was left. Because if this jury follows the law, and considers the circumstances in aggravation, and those couple perhaps in mitigation that has been offered by the defense, this isn't even a close decision, if you follow the law. It is not close. It is one sided. So the defense had to resort to something other than the law, something other than the facts to try to get the result which they wanted for their client. And the aggravation evidence that the People put on . . . went unchallenged by the defense. You know, that just went unchallenged, unquestioned. I mean, there was no challenge to the murder of Cheryl Renee Wright. There was no challenge involving the rape, and attempted rape of [P.]. There was no challenge to the threats of Jim Rhiley. There was no challenge to the violent words to Downing. There was no challenge to the fact that the Defendant threatened to kill his deceased wife's brother. There was no challenge to the threats of, 'I'll smash your face, I'll blow up your house,' and so on that were made over a period of time to Claudia Ameral. There was no challenge about the time that the Defendant fired the shotgun at his neighbor in 1965. There was no challenge about the vandalism, the smashing

violation of the rule declared in *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. As we have noted, "Prosecutorial comment which draws attention to a defendant's exercise of his constitutional right not to testify, and which implies that the jury should draw inferences against defendant because of his failure to testify, violates defendant's constitutional rights." (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 757 [175 Cal.Rptr. 738, 631 P.2d 446].)

Defendant's claim fails at the threshold, as he failed to preserve any claim of error by specifically and contemporaneously objecting at trial, and no reason appears why an admonition, if requested, would not have remedied any improper effect of the remark. (*People* v. *Noguera, supra*, 4 Cal.4th 599, 638.) Were we to reach the claim's substance, we would find it lacking in merit. Because nothing suggests only defendant's testimony was capable of "challenging" the aggravating evidence, it cannot be said the prosecutor's summation served to point a finger at defendant's failure to take the stand. Rather, it amounted to fair comment on the state of the evidence.

### c. *Reference to Defendant's Prior Murder Conviction*

Defendant contends the prosecutor engaged in misconduct in the following reference to his 1975 conviction for the murder of Kathy Stanley. "[Defendant shortly after his arrest on the prior murder charge] indicated that he was going to pretend that he was mentally ill and knew how to get away with that with the psychiatrists. And that he would get out in two or three years. . . . [¶] So here you have a man that has been arrested. He is already planning to use or manipulate psychiatrists so he could get out in two or three years. And lo and behold he almost makes it—four and a half years for the second degree murder of his second wife, Kathleen." This argument, defendant contends, implied his prior murder was actually of the first degree, when the jury in that case found it to be of the second degree, and suggested the jury in the present case should correct that injustice by "overcompensating" in the penalty decision at hand. He likens the prosecutor's argument in this respect to that disapproved in *People* v. *Haskett* (1982) 30 Cal.3d 841, 867 [180 Cal.Rptr. 640, 640 P.2d 776] (*Haskett*). In *Haskett* the prosecutor, during penalty phase argument, repeatedly suggested that by failing to convict the defendant of rape and robbery during the guilt phase, jurors had failed to follow the law, and invited them to correct their "wrong

---

of the car. There was no challenge about the threats to the life of a first wife, Linda Faith, that, 'I will take care of you like I did Kathy,' there was no challenge to the threats that were made to Barbara Gwiazdon, and her family. None whatsoever about going to get her, her crippled husband, and her children on the way home from school. There was no challenge whatsoever to any of those. And those matters go on the scale, and these are matters that this jury can consider."

decision" in the penalty phase. (*Id.* at p. 864.) We strongly disapproved the prosecutor's argument, calling it an impermissible attempt to reopen the process of adjudication. (*Id.* at p. 866.)

Defendant failed to preserve this argument by a timely and specific objection at trial, and no reason appears why an admonition, if requested, would not have remedied the effect of the remarks. (*People* v. *Noguera, supra,* 4 Cal.4th at p. 638.) Even had the point not been waived, the attempted comparison of this case to *Haskett* fails. We find nothing in the cited comments resembling a suggestion that the murder of Kathy Stanley was actually of the first degree, or that the jury in the present case should right the prior jury's wrong decision by voting for death. Rather, the prosecutor's comments were permissibly designed to suggest, based on the evidence in the record, that defendant was capable of manipulating psychiatrists such as Dr. Axelrad.

### d. *Comment on Defendant's Age*

Defendant next contends the prosecutor engaged in misconduct by arguing for a death verdict based on defendant's age at the time of the crime. Again, the point is waived for failure to make a timely and specific objection below. (*People* v. *Noguera, supra,* 4 Cal.4th at p. 638.) Were it not, we would find no misconduct warranting reversal. We have previously held age, as used in section 190.3, factor (i), to be neither an aggravating nor a mitigating factor in and of itself, but rather a "metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) Consequently, either counsel may argue age-related inferences in any case. (*Ibid.*) The prosecutor's rebuttal argument that defendant's age (35) could be considered a circumstance in aggravation because it signified he "kn[ew] about life. He kn[ew] what to expect of it. He kn[ew] what the rules of society are. He kn[ew] murder is wrong" merely asked the jury to infer defendant's age and attendant experience in life rendered him more culpable than a "young kid" who knew "nothing about life." This reasoning was entirely proper, and it is not reasonably possible the use of the label "circumstance in aggravation" could have affected the jury's verdict. (*People* v. *Allen, supra,* 42 Cal.3d at p. 1284.)

### e. *Sympathy for Victims*

Defendant contends the prosecutor engaged in misconduct by asking the jury to exercise sympathy for the victims and their families in determining

the penalty.[32] He contends such an argument injects an impermissibly arbitrary element into the penalty decision and risks verdicts based on fury and rashness rather than reasoned consideration. The United States Supreme Court and this court have upheld "victim impact" evidence and arguments generally against constitutional and statutory challenge. (*Payne* v. *Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] [rejecting Eighth and Fourteenth Amendment challenges]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 832-836 [1 Cal.Rptr.2d 696, 819 P.2d 436] [concluding, inter alia, victim impact evidence and argument are admissible as bearing on section 190.3, factor (a), circumstances of the crime].) The prosecutor's argument in this case fell within the general bounds of propriety, as it was not so inflammatory or emotional as to divert the jury's attention from its proper role or invite an irrational, purely subjective response. (*People* v. *Edwards*, *supra*, 54 Cal.3d at p. 836.) We therefore find no misconduct.

### f. Comments Invoking Prestige of Prosecutor's Office and Alluding to Personal Knowledge of Facts

▇ Defendant complains that in urging the jury to return a verdict of death, the prosecutor improperly relied on the prestige of the district attorney's office in alluding to its decision to seek the death penalty against him. The point is waived for lack of a timely and specific objection. (*People* v. *Noguera*, *supra*, 4 Cal.4th at p. 638.) Were we to reach the merits, we would reject it. The prosecutor neither invoked the prestige of his office, nor cited his own personal knowledge, in support of the argument defendant was more deserving of the death penalty than other murderers. In essence, the prosecutor merely sought to persuade the jury that both the facts of Cindy's

---

[32]The prosecutor argued as follows: "What about other people, other family members, others—not sympathy or pity for Mr. Stanley. And we will go into that a little later.

"And it is not just Mr. Stanley that has emotions, not Mr. Stanley's family that has emotions. But there are other people that have emotions that are concerned with this case. They are those people that are the parents of Cindy Rogers Stanley—[objection by defense; overruled] [¶] There are those people that are the parents of Cheryl Renee Wright, Jim and Pat Rhiley, the parents of Kathleen Stanley—these people also have feelings. And of course I represent the People. But I think to a certain extent, I represent the interest, you know, of the victims. I mean, they aren't here . . . [y]ou can't see Kathleen. You can't see Cheryl Renee. You can't see Cindy. They aren't here. They can't come into the courtroom. They can't, as such, be a part of the proceedings. [¶] I guess the closest that I can do by bringing them into the courtroom is to show you their photos. I know really of no other way to do it so that your attention, if you are going to consider emotions, that at least your attention is at least equally split between Mr. Stanley, and between the victims. [¶] Exhibit 90-B. And this is really what we get down to, this is really the guts of the case. This is really what we are talking about. This is what you see of what Kathy Ann—this is the product of what Mr. Stanley did. [Objection; overruled.] [¶] Exhibit 241, Cheryl Renee Wright—the photograph of her. Nice attractive young lady. [¶] 5-G, photograph of Cindy. This is what Mr. Stanley has done. This is the aggravation."

murder and defendant's personal history warranted a verdict of death, properly observing that not every murder, or even every murder with special circumstances, would call for the ultimate penalty.[33]

### 7. Refusal to Delete Portions of Videotape

At defendant's behest and over the prosecution's objection, the 12½ hours of videotape of Dr. Axelrad's narcohypnotic interview of defendant was played to the jury in connection with Dr. Axelrad's testimony concerning defendant's asserted mental disorders.[34] ■ The trial court, however, denied defendant's motion under Evidence Code section 352 to edit the tapes to omit any reference to defendant's third wife, Diana Lynn, and his rape of Cindy. Relying on *People* v. *Coleman* (1985) 38 Cal.3d 69 [211 Cal.Rptr. 102, 695 P.2d 189], defendant contends the trial court's ruling constituted prejudicial error.[35]

In *Coleman, supra*, the defendant had shot his wife, child and niece. His defense was diminished capacity. In forming their opinions, the defense psychiatrists had relied in part on three letters written by the defendant's wife in which she stated the defendant had many times threatened to kill the family and had twice before threatened to hurt her. Over defense objection, the trial court permitted introduction of the letters for the limited purpose of cross-examining the defense's expert witnesses. This court reversed.

Recognizing that courts have traditionally given parties wide latitude in the cross-examination of experts to test their credibility, including use of evidence inadmissible on direct examination, this court stated: "Nevertheless, the trial court must exercise its discretion pursuant to Evidence Code section 352 in order to limit the evidence to its proper uses." (*People* v.

---

[33]The prosecutor argued as follows: "And in Mr. Stanley's case, you see, you not only have a crime itself, that makes him come within special circumstances, and allows him to receive the verdict of death, but you have it both ways. You also have an individual whose background by reasons of the prior murder conviction, also brings him within special circumstances, also allows the jury to impose a verdict of death. [¶] So, it is not every case of murder, not every case of first degree murder, and it is fair to say it is not even in every case of murder with special circumstances where a death penalty would be asked of the jury."

[34]In addition to the videotapes, Dr. Axelrad had 29 hours of audiotapes of his interviews with defendant, which were not played to the jury. Outside the presence of the jury, he testified it was more important for the jury to see the videotapes than hear the audiotapes and that both sets covered basically the same material.

[35]Defendant does not directly cite the references to Diana Lynn that were the basis of his motion to delete. Rather, he refers to pages of the record where the defense cited particular pages of the videotape and audiotape transcripts. Most of the references are to the audiotapes. Because neither the audiotapes nor the transcripts are part of the record and the audiotapes were not introduced into evidence, the contents of those tapes have no relevance to this appeal.

*Coleman, supra,* 38 Cal.3d at p. 92.) In *Coleman,* we concluded the trial court abused its discretion by permitting extensive questioning of the expert witnesses on the contents of the letters. "Accusatory statements 'from the grave' such as these," we stated, "have so great a potential to unfairly prejudice the defendant that the courts have long recognized that a limiting instruction will be insufficient to prevent improper use. [Citations.]" (38 Cal.3d at p. 93.) The letters, we observed, were not of major significance in the experts' evaluation of the defendant's mental capacity, and those portions that the prosecutor "legitimately offered" to challenge the psychiatric opinions "could have been selected and presented in a fashion which would have lessened their emotional impact and would have avoided the improper inference that the victim's accusations were true." (*Ibid.*)

Unlike in *Coleman,* in this case the tapes were offered by the defense, over the prosecution's objection. Dr. Axelrad was of the opinion defendant suffered, inter alia, from intermittent explosive disorder. In a hearing outside the presence of the jury, Dr. Axelrad testified that one of the criteria for intermittent explosive disorder is "intermittent episodes of loss of control of aggressive behavior which results in violence or serious destruction of property." Much of the basis for his opinion appeared in the videotaped narcohypnotic interview with defendant, and he believed viewing the tape would assist the jury in understanding the basis for his opinion. In making his diagnosis, he used all the information available to him, although not all the information was necessary to his ultimate conclusion. He specifically considered the various episodes of unprovoked violence he knew of, including the alleged sexual assault against Cindy. Although he felt it was important to explore defendant's relationship with Diana Lynn, and he considered the information defendant provided about the relationship, that information was not essential to his diagnosis because defendant did not disclose any behavior toward Diana that was consistent with his disorder. Defendant had made it a condition of the narcohypnotic interview that Dr. Axelrad not ask him anything about Diana Lynn.[36] Such a precondition to an interview, Dr. Axelrad testified, can influence its outcome and would be important to know about in evaluating the procedure.[37]

Following argument, the trial court denied defendant's motion to exclude the references to the rape charges and Diana Lynn. The court determined the

[36]Dr. Axelrad knew from investigative reports and prior interviews with defendant that defendant married Diana Lynn while he was in prison for the murder of his second wife, Kathy, and that some months after defendant's release from prison Diana disappeared. In prior interviews defendant had denied he had anything to do with Diana's disappearance and claimed she was still alive.

[37]In response to the prosecutor's question whether the promise alone could be enough to ruin the validity of the hypnotic experience, Dr. Axelrad stated: "No. It certainly can—it certainly . . . makes the procedure a procedure that has to be much more critically examined in terms of the information provided. It is not an ideal situation. In fact, it is a situation that

probative value of the evidence "substantially outweighs" the probability its admission would create substantial danger of undue prejudice.

The court's ruling was not an abuse of discretion. As the court observed, Dr. Axelrad testified all the matters on the tape were considered by him. The alleged rape of Cindy was "essential" to his diagnosis. Further, in Dr. Axelrad's view the rape bore a significant relationship to defendant's murder of Cheryl Renee Wright, in that it was likely defendant killed Cheryl after she rejected his sexual advances, just as he killed Cindy after he allegedly raped her. Unlike the accusatory letters in *People* v. *Coleman, supra,* 38 Cal.3d 69, Cindy's charges did not accuse defendant of the very act for which he was on trial, the charges were supported by independent evidence known to Dr. Axelrad, and they did not undermine the defense. To the contrary, Cindy's charges supported the defense of intermittent explosive disorder.

Although the references to Diana Lynn were not essential to Dr. Axelrad's intermittent explosive disorder diagnosis, Dr. Axelrad considered defendant's relationship with Diana Lynn important, and his promise not to question defendant about Diana Lynn was relevant to the validity of the interview. The references, moreover, were of themselves innocuous.[38] At no time do they indicate Diana Lynn met with violence or that defendant was connected with her disappearance. Defendant does not contend otherwise. Rather, he complains that the prosecutor, in cross-examining Dr. Axelrad, went over the alleged rape of Cindy and the disappearance of Diana Lynn in some detail, thereby ensuring the information "would impress the jury" when it came time to make its penalty decision. But the scope of the prosecutor's cross-examination was not before the court when it denied defendant's motion to edit the tapes, nor did defendant object during the cross-examination. Neither does defendant raise the prosecutor's cross-examination as error on appeal.

---

the person examining the individual in the interview, the hypnotic interview, in reviewing the information after the interview is over, has to be very careful in terms of interpreting any information because of the promise. It is not ideal. It is far from being ideal."

[38]The videotape references to which defendant objected were as follows: (1) defendant accused his investigator of wanting to listen to his hypnotic interview in the hope of finding the whereabouts of Diana Lynn and the man she is with, because of the "extremely large reward" offered for the man; (2) Dr. Axelrad mentioned having discussed with defendant's mother an experience she had with defendant "during the time that Diana Lynn was in jail"; (3) defendant said he had seen a picture of Diana Lynn in a fishing and hunting newsletter that she must have sent in knowing he would see it; (4) defendant, while discussing the mileage he put on the Camaro, mentioned that during that time he was "thinking about driving to Lakeview [Oregon] to try to see Diana"; (5) Dr. Axelrad promised defendant that he would return Diana Lynn's diary to defendant's mother; (6) defendant stated he asked his parole agent about his "red diary from Diana Lynn's"; (7) Dr. Axelrad, in the context of discussing an incident between defendant and his mother, suggested that defendant was angry with his mother because she did not like Diana Lynn and would not help defendant bail her out of jail.

The probative value of the references to Diana Lynn lay not in the truth of anything said on the tape, but in the fact that, despite the admittedly important contribution to Dr. Axelrad's diagnosis information about defendant's relationship with her would have made, Dr. Axelrad asked defendant no questions about it because of a promise he had made to defendant, which promise detracted from the interview as a valid diagnostic tool. Consequently, even had the references to Diana Lynn been deleted from the tapes, the prosecutor clearly would have been entitled to cross-examine Dr. Axelrad on matters that he admitted weakened the validity of the interview.

The trial court, having ruled the tapes were admissible, did not abuse its discretion in ruling "the entire matter" should be presented to the jury.

### 8. *Refusal to Re-Voir Dire Jury at Resumption of Penalty Phase*

The penalty phase of this case was interrupted for more than three months by the trial on the issue of defendant's competency. Defendant complains this extended hiatus created a significant risk the penalty phase jurors would be exposed to prejudicial extraneous information about the case. He contends the trial court erred in refusing his request that each member of the jury be questioned as to whether anything had occurred during the interruption that would interfere with his or her ability to continue as a fair and impartial juror.

The right of every criminal defendant to trial by a jury that considers only the evidence admitted in court is, of course, fundamental. (U.S. Const., Amends. VI, XIV; Cal. Const., art. I, § 16; *Turner* v. *Louisiana* (1965) 379 U.S. 466, 472-473 [13 L.Ed.2d 424, 428-429, 85 S.Ct. 546].) "It is well settled that it is misconduct for a juror to read newspaper accounts"—or, one could add, to listen to broadcast media reports or otherwise to acquire extrajudicial information regarding—"a case on which he is sitting . . . ." (*People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108 [269 Cal.Rptr. 530, 790 P.2d 1327].) Defendant concedes the defense ordinarily bears the burden of establishing misconduct (*People* v. *Marshall* (1990) 50 Cal.3d 907, 949 [269 Cal.Rptr. 269, 790 P.2d 676]), but argues the length of the hiatus in his case should raise a presumption jurors were exposed to improper material, thereby obviating the need for a specific showing of misconduct. We decline to create such a rule. During the trial, the trial court admonished the jurors each evening to avoid discussing the case, forming or expressing any opinion on it, or reading or listening to anything connected with the case that might appear in the news media. Just before the hiatus, the court gave a

particularly strong admonition, set forth in the margin.[39] In the absence of any contrary showing, we presume the jurors followed the admonition. (See *People* v. *Lanphear* (1980) 26 Cal.3d 814, 835-836 [163 Cal.Rptr. 601, 608 P.2d 689]; Evid. Code, § 664.)

### 9. *Admission of Photographs*

 Defendant contends the trial court erred in admitting, over his objection, People's exhibits Nos. 90-B and 90-C, two photographs of Kathy Stanley's slain body. The first showed the body lying supine on the ground near the automobile at the crime scene; the second, shot from a greater distance, showed the body covered by a sheet. Defendant argued at trial, and renews his argument here, that the photographs were irrelevant and unnecessary because the prosecution had already proved defendant was convicted of Kathy Stanley's murder. The court overruled the objection, commenting the photographs were neither gruesome nor offensive and depicted the

---

[39]"Now, the Court would advise the jury that we're going to be taking a recess in these proceedings, and at this time the Court is not in a position to advise the jury of the length of the recess. So you'll be retained on call, and the Court read Mrs. Kester's situation, and, of course, we have alternative jurors.

"The Court would anticipate that we would be able to give you a week or two weeks' notice of when to return to court. Hopefully we'd be able to give you two weeks' notice, but at least a week's notice. So we would ask you to go about your daily life as usual, resume your usual activities, do what you have scheduled, and—but you're being retained on call, and at the appropriate time, the Court will cause you to be notified.

"Now, pending your return on call, the Court would mention this admonition. As I have explained to you a number of times, the wording of the admonition is that it's your duty as jurors not to discuss this case or anything pertaining to it either amongst yourselves or with any other person or persons, nor permit it to be discussed in your presence.

"It is further your duty as jurors not to form or express any opinion concerning any issue here until such time as you've heard all of the evidence and the arguments of Counsel and the Court's instructions as to the law, and the Court has placed it in your hands for your decision in the sanctity of the jury room.

"And should there be anything in the news media, either the newspaper, radio or television news, concerning this trial or anything remotely related to it, you're requested, admonished, instructed and directed to immediately refrain from reading, viewing, or listening to the same as the case may be.

"Now, I'd like to enlarge upon this admonition a little bit. The Court is asking you to go about your daily life as usual, as if you weren't on jury duty. The Court would caution you not to permit anyone to approach you, nobody in your family, or where you work, or allow anyone to make any comment to you, and avoid any of the news media, so as to—when you return to court, that you will be in the same state and frame of mind, not contaminated by any outside—anything outside the courtroom that you've heard here in this courtroom.

"As the Court has indicated, at this time the Court is unable to give you an approximation as to when you will return, but bear in mind this is a very important admonition, very important admonition, and go about your daily lives and vacations, what you have planned, and remain on call, though.

"At this time, then, we'll excuse you—we aren't releasing you, merely excusing you, subject to being kept on call."

location of the murder in relation to the school grounds. We find no abuse of discretion in the admission of People's exhibits Nos. 90-B and 90-C. As the trial court noted, the photographs were neither gruesome nor inflammatory, and they helped to illustrate the circumstances of defendant's prior murder. As such, they had obvious relevance and did not unduly prejudice defendant.

Defendant argues the trial court erred in admitting photographs depicting Cheryl Renee Wright's murdered body at the well site where the body was discovered. The prosecution offered a series of photographs showing how the body had been weighed down with boards, which in turn were covered with boxes of gravel and loose gravel. The pictures were clearly relevant to show defendant's efforts to conceal the body and how he had come into contact with the gravel. They illustrated the testimony of the state geologist, who identified the gravel at the well site as being of the same type as that found in defendant's car. Defense counsel objected to admission of all of the well site photographs, and the trial court indicated agreement with the defense as to two photographs depicting the corpse's torso and limbs. The prosecutor then withdrew his offer of those two photographs, and the trial court admitted the remaining photographs, which focused on the gravel, oil and debris and revealed smaller portions of the body. Defendant now contends that because eyewitnesses testified regarding the condition of the body, and because there was no defense challenge to the expert testimony linking the gravel found in the Camaro with that at the well site, admission of the photographs constituted prejudicial error. We disagree. Photographic evidence is not inadmissible merely because it illustrates eyewitness testimony or confirms other unchallenged evidence. (*People* v. *Thomas* (1992) 2 Cal.4th 489, 524 [7 Cal.Rptr.2d 199, 828 P.2d 101].) We conclude the Wright photographs were neither cumulative, gruesome, nor inflammatory. The trial court did not abuse its discretion in admitting them.

10. *Claims of Instructional Error*

a. *Refusal to Modify Limiting Instruction*

 The court instructed the jury they could consider defendant's statements in the videotapes only for the limited purpose of showing the information on which Dr. Axelrad based his opinion and not for the truth of the facts asserted in the statements. Citing *Green* v. *Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150] (*Green*) and *People* v. *Harris, supra,* 36 Cal.3d 36 (*Harris*), defendant contends the court erred in refusing to modify the limiting instruction to instruct the jury they could consider the tapes for whatever mitigating value they had. This argument is meritless.

In *Green, supra,* 442 U.S. 95, the United States Supreme Court held due process concerns overrode state evidentiary rules, so as to require admission,

at the penalty phase of a capital trial, of a highly relevant and reliable hearsay statement in which defendant's crime partner, separately tried, had admitted he committed the killings. The statement had been admitted at the crime partner's trial, but under Georgia's hearsay rules was inadmissible at defendant's trial. (*Green, supra*, 442 U.S. at pp. 96-97 [60 L.Ed.2d at pp. 740-741].) In *Harris, supra*, 36 Cal.3d 36, three members of this court in a plurality opinion expressed the view that, under *Green*, the trial court had erred in refusing at the penalty phase to admit poetry the defendant had written while in custody on another offense and before he was charged in the capital case. The opinion emphasized, however, that the *Green* theory of admissibility "require[s] that the proponent of the evidence show that the evidence is trustworthy or reliable." (36 Cal.3d at p. 70; see also *People* v. *Livaditis* (1992) 2 Cal.4th 759, 777-780 [9 Cal.Rptr.2d 72, 831 P.2d 297]; *People* v. *Edwards, supra*, 54 Cal.3d 787, 818-821, 837-839.)

In the instant case the tapes had no indicia of reliability. The statements did not predate the instant charges; rather, they were made contemporaneously with the criminal proceedings and specifically to provide evidence for the defense. The conditions under which the statements were made cast further doubt on their reliability. According to Dr. Axelrad, defendant would tell the truth only if he wanted to, so the reliability of the information was no greater than that obtained in any ordinary interview, and he had so informed defendant; the limitation defendant placed on questions about Diana Lynn required that the procedure be "much more critically examined" than otherwise in evaluating its reliability; and hypnosis can induce not only enhanced memory, but hypermesia, or "increased memory," that may result in information that is not true.

In these circumstances, the court did not err in refusing to modify its limiting instruction. Any contrary ruling would have permitted defendant to give self-serving testimony free from cross-examination as to its validity.[40]

*Gregg* v. *Georgia* (1976) 428 U.S. 153, 204 [49 L.Ed.2d 859, 891-892, 96 S.Ct. 2909] and *State* v. *Davis* (1984) 96 N.J. 611 [477 A.2d 308, 314, 47 A.L.R.4th 1055], also cited by defendant, are inapposite. Those cases argue for a broad view of relevancy in the sentencing phase of a death penalty case; they are not authority for the proposition that potentially unreliable evidence should be admitted in the absence of an opportunity for confrontation. In the case at bench, the defense was free to introduce competent

---

[40]In the videotaped interview defendant denied responsibility for the murders of Cindy and Cheryl Renee Wright and the arson of Cindy's house, blaming others for those acts. He claimed amnesia concerning the actual shooting of Kathy and asserted he should have been convicted of manslaughter rather than murder.

evidence, including defendant's testimony, of the matters referred to on the tape, including his remorse for Kathy's murder, his regret over his brother's suicide, his love for his family, and the like. The court, however, properly denied defendant's motion to present such evidence without affording the prosecution the opportunity for cross-examination.

### b. *Refusal to Instruct on Mercy*

Defendant contends the trial court erred in refusing to instruct the jury that in determining the appropriate penalty it could consider mercy. The jury in this case was instructed to consider, among other factors, "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime" and "[a]ny other aspect of the defendant's character or record that the defendant proffers as a basis for a sentence less than death including but not limited to defendant's character, background, history, mental condition, physical condition, and sympathy or pity for the defendant." We have repeatedly held that a jury told it may sympathetically consider all mitigating evidence need not also be expressly instructed it may exercise "mercy." (*People* v. *Montiel* (1993) 5 Cal.4th 877, 943 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1067 [251 Cal.Rptr. 757, 761 P.2d 680].) Defendant suggests no persuasive reason to depart from our precedents.

### c. *Brown Error*

Defendant argues the instructions given in this case, in delineating the scope of the jury's sentencing discretion, impermissibly left "room for . . . confusion" (*People* v. *Brown*, *supra*, 40 Cal.3d 512, 544, fn. 17), a potential that was exacerbated by the trial court's refusal to instruct the jury it could exercise mercy. We have reviewed the record (*People* v. *Proctor*, *supra*, 4 Cal.4th 499, 547) and conclude the jury was not misled to believe it was required to impose the death penalty. The jury was instructed, inter alia, as follows: "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account, and be guided by the following factors, if applicable: [¶] . . . [¶] (K) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime. [¶] (L) Any other aspect of the defendant's character or record that the defendant proffers as a basis for a sentence less than death including but not limited to defendant's character, background, history, mental condition, physical condition, and sympathy or pity for the defendant." The instructions were sufficient to apprise the jury of the scope of its discretion. The prosecutor's

closing argument did not, contrary to defendant's assertions, increase the potential for confusion; rather, it conveyed to the jury the necessity of weighing evidence in aggravation against that in mitigation. Defense counsel's closing argument further emphasized the discretionary nature of the jury's determination and the propriety of exercising mercy. We see no possibility the jury was misled.

### d. *Reasonable Doubt Instruction*

In addition to his other claims of instructional error in the penalty phase, defendant reiterates his constitutional challenges to CALJIC No. 2.90, which was read to the jury in connection with the evidence of other criminal activity introduced against defendant. (§ 190.3, factor (b).) For the same reasons that we rejected his arguments in the guilt phase portion of his appeal, we reject them here. (See *Victor* v. *Nebraska, supra,* 511 U.S. __, __ [127 L.Ed.2d 583, 595-596, 114 S.Ct. 1239]; *People* v. *Freeman, supra,* 8 Cal.4th at pp. 503-504.)

### 11. *Constitutionality of 1978 Death Penalty Law*

Defendant argues that California's death penalty law, and instructions predicated on the statutory language, are unconstitutional in various respects.

Defendant contends that under the rule of *Stringer* v. *Black* (1992) 503 U.S. 222 [117 L.Ed.2d 367, 112 S.Ct. 1130] certain sentencing factors set forth in section 190.3 are unconstitutionally vague. Specifically, he argues the language of section 190.3, factors (a), (b), and (i), as read to the jury, fails adequately to define the elements of those factors. We have previously rejected this argument (see, e.g., *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1096-1097 [25 Cal.Rptr.2d 867, 864 P.2d 40] [factor (a)]; *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 478 [24 Cal.Rptr.2d 808, 862 P.2d 808] [factor (b)]; *People* v. *Noguera, supra,* 4 Cal.4th at p. 649 [factor (i)], and the United States Supreme Court has likewise upheld the factors against federal constitutional challenge. (*Tuilaepa* v. *California* (1994) 512 U.S. __, __ [129 L.Ed.2d 750, 762-764, 114 S.Ct. 2630].) Defendant also contends factor (k) (§ 190.3, factor (k) [allowing the jury to consider any other circumstance that extenuates the gravity of the crime, even though it does not provide an excuse]), in the context of the prosecutor's argument, invited the jury to consider evidence of defendant's background *in aggravation*. Defendant's reasoning is not altogether clear, but in any event the contention lacks merit. The prosecutor merely commented on the paucity of mitigating evidence introduced by the defense; in no way did he convert factor (k) into an aggravating factor.

Defendant contends the trial court erred in not deleting from the section 190.3 instruction those factors having no relevance to this case, and in not specifically informing the jury which factors are aggravating and which mitigating. We have rejected these arguments many times before, and defendant presents no reason to depart from our earlier decisions. (See, e.g., *People v. Wash* (1993) 6 Cal.4th 215, 271 [24 Cal.Rptr.2d 421, 861 P.2d 1107] [failure to characterize the penalty factors as either aggravating or mitigating does not render the statute unconstitutional]; *People v. Fauber, supra*, 2 Cal.4th 792, 866 [failure to delete inapplicable penalty factors from jury instructions is not erroneous].) Defendant also argues the failure to require written findings by the jury on the aggravating factors it selected deprived him of his right to meaningful review of his sentence under the Eighth and Fourteenth Amendments; we have previously held to the contrary. (*People v. Fauber, supra*, 2 Cal.4th at p. 859.) He contends California law is constitutionally defective for not requiring the jury to find that all aggravating factors it employs, as well as the ultimate determination that death is the proper penalty, were proven beyond a reasonable doubt. We rejected these contentions in *People v. Webb* (1993) 6 Cal.4th 494, 536 [24 Cal.Rptr.2d 779, 862 P.2d 779]) and other cases.

Defendant also contends intercase proportionality review is constitutionally required. It is not. (*Pulley v. Harris* (1984) 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 40-41, 104 S.Ct. 871].)

Defendant argues that the adjectives "extreme" and "substantial," modifying two of the mitigating factors (§ 190.3, factors (d) and (g)), render those factors unconstitutionally vague, arbitrary and incapable of principled application, while erroneously suggesting to the jury such evidence may not be considered if less than extreme or substantial. We have rejected similar arguments in the past, and defendant submits no persuasive reason to change our views. (See, e.g., *People v. Clark* (1992) 3 Cal.4th 41, 163 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1227 [275 Cal.Rptr. 729, 800 P.2d 1159].)

Defendant contends the 1978 death penalty law is unconstitutional because it contains so many special circumstances that it fails to perform the narrowing function required by the Eighth Amendment and to provide a " 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " (*People v. Edelbacher, supra*, 47 Cal.3d at p. 1023, quoting *Furman v. Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 392, 92 S.Ct. 2726].) This contention has been rejected by the United States Supreme Court (*Pulley v. Harris, supra*, 465 U.S. at p. 53 [79 L.Ed.2d at p. 42]) and by this court (see, e.g.,

*People* v. *Wader, supra,* 5 Cal.4th 610, 669). Defendant mounts a further constitutional attack on the "unbounded" discretion prosecutors exercise in deciding in which cases to seek the death penalty. We have previously declined to find any constitutional infirmity in this aspect of California's death penalty scheme. (*People* v. *Wash, supra,* 6 Cal.4th at p. 272; *People* v. *Keenan, supra,* 46 Cal.3d at p. 505.) Defendant offers no reason why we should depart from these earlier decisions, and we adhere to them.

## III. DISPOSITION

The judgment is affirmed.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied September 13, 1995, and the opinion was modified to read as printed above.